MISSOURI, KANSAS & TEXAS RAILWAY COMPANY OF TEXAS v. J. J. SANDERS.

No. 1385.

1. **Railroad—Ejecting from Train.**

See evidence held to support a recovery, though conflicting, for being ejected by the conductor from rear platform of train.

2. **Impeaching Witness—Contradictory Statements.**

A conductor who has testified that he ejected plaintiff from the train by gently placing his hand on his shoulder may, upon proper predicate being laid, be im-

peached by showing that he had stated in conversation that he "knocked the d—d scoundrel off the train."

**3.  Evidence—Res Gestae—Declarations of Pain.**

One who accompanied the plaintiff home after his injury may testify that after they had gone about thirty-five yards from the place, plaintiff complained very much of his injuries and said he could go no further and requested witness to go to town for a carriage.

**4.  Same.**

The character of an injury may be explained by exclamations of pain and terror at the time the injury is received. So, when sickness or hurt is in litigation, declarations to a physician as explanatory of the conclusions of such physician, or groans or gestures, instinctive declarations of present pain, not involving a statement of the cause of the injury, no matter how long after the injury was received. See case for statements of pain made to physician on day after the injury, properly so admitted.

APPEAL from Caldwell.   Tried below before HON. H. TEICHMUELLER.

The opinion states the evidence in support of the verdict.   The evidence for defendant was as follows:   L. W. Cherington, the conductor, testified: that the men were found crouched down upon the rear steps of the sleeper, acting in a suspicious manner, that when accosted and asked what they were doing there, they gave an evasive answer; that when told to get off at the switch, he refused and said he did not have to get off. "When the train stopped to throw the switch he did not get off.  We went through the switch on to the main line and when the train stopped I again went to him and told him he must get off.   He made some motion as if to draw a pistol, and just then the train started and I stepped into the car and pulled the air whistle for the train to stop, and it did stop, not going more than four or five steps, and I again went to the man and said you must get off of here.   He again threw his hand behind him as if to draw a pistol; I thought he was going to draw one.   He was standing on the lower step of the car, holding on to the railing with one hand, and I placed my hand on his shoulder and gave him a slight push and he jumped back; he did not fall, but stepped to the ground and stood erect on his feet.   I saw him standing by the track as I pulled the cord to signal the train to start.   Lindeman, the sleeping-car conductor, was standing by me on the platform of the sleeper, and as I started the train I pushed him into the car and said, look out, that fellow might shoot. The train was not moving when Sanders was put off, and I know he did not fall when he swung off to the ground."   Lindeman, the sleeping-car conductor, agrees with Cherington as to the above statement, and said that, as the car started, he saw a man standing up by the side of the track about ten feet from the car on the side where plaintiff had been standing.   "We were between the switch and the cattle guard when I saw the man standing by the track."

Jake Green, the brakesman, said:  "As I was standing at the switch the train passed onto the main line.   I saw the man standing on the lower step of the rear sleeper.   I closed the switch and went to the opposite step and got on the car and the train started.   I saw Mr. Cherington pull the cord for the train to stop, and it did.   I then saw him go to the man

on the steps. I could not see what was done, but Mr. Cherington immediately turned back and signaled the train to start and said, 'Look out, boys, that fellow may shoot.' As the train moved I saw a man standing there by the track. When the train was stopped the second time it was about fifteen steps from switch. The cattle guard is about thirty steps from the switch."

*Storey & Storey,* for appellant.—1. The evidence showed that the injury was the result of necessary force used in ejecting plaintiff from the train. Plaintiff was a trespasser, and under the evidence a new trial should have been granted. The verdict does not conform to the charge of the court.

2. Declaration of the witness, Will Sears, as to statement of the conductor on said train several days after the alleged act out of which the suit grew, that Sanders got on the train, that he told him to get off, that Sanders refused and he knocked the d——n scoundrel off the train, was hearsay and not admissible as evidence, and a pretense of contradicting the witness by said statements will not qualify them as evidence. Leahey v. Railway, 97 Mo., 165; 10 S. W. Rep., 58; State v. Rider (Mo.), 8 S. W. Rep., 723; City of Austin v. Ritz, 72 Texas, 391; Wharton on Ev., secs. 258-267; Railway v. Crowder, 61 Texas, 262; Fordyce v. McCants, 51 Ark., 509; 11 S. W. Rep., 644.

3. The complaints of injuries made by plaintiff to Witness Van Flowers, thirty-five yards from where he was ejected from the train, were not res gestae, and were self-serving and not admissible. Same authorities.

4. The statements as to his sufferings made by plaintiff to Dr. Trigg on the day after the injury were self-serving and inadmissible. Fordyce v. McCants, 51 Ark., 509.

*Stringfellow & Coopwood,* for appellee.—1. The verdict in this cause does conform to the charge of the court, when considered in connection with the evidence.

2. A new trial should never be granted on account of a conflict in the testimony. The jury are the exclusive judges of the weight of the testimony. Linney v. Wood, 66 Texas, 22; Stitzle v. Evans, 74 Texas, 596; Wright's Admr. v. Donnell, 34 Texas, 305; Legg v. McNeill, 2 Texas, 428.

3. The admission of the testimony of J. W. Sears over the objection of appellant was not error. It was admissible as affecting the credibility of Cherington.

4. The admission of the testimony of Van Flowers and Dr. A. L. Trigg as to statements made by appellee of the existence and locality of pain was not erroneous. Such statements were res gestae. Railway v. Barron, 78 Texas, 421; Railway v. Shaffer, 54 Texas, 641; Railway v. Newell, 104 Ind., 264; Railway v. Wood, 113 Ind., 544; Quaife v. Railway, 48 Wis., 513; Best on Evidence, 663.

COLLARD, ASSOCIATE JUSTICE.—Suit by appellee against appellant for actual and vindictive damages, brought the 14th day of March, 1894, for alleged wanton and illegal ejection of plaintiff from the platform of the defendant's passenger Pullman car by pushing him off the platform while the train was moving at a high rate of speed, causing him physical and mental injuries and expenses set out in the petition. The court below sustained exceptions to the suit for vindictive damages.

Upon a trial by a jury verdict was returned for plaintiff for $550, actual damages, for which judgment was rendered and from which the railway company has appealed.

The principal question presented by assignments of error is that the verdict is not supported by the evidence and the court below should have granted a new trial.

*Opinion.*—There is a conflict in the testimony on the main question, as to the force and violence used by the conductor in ejecting plaintiff from the platform of the car, and also on other questions; but upon the assumption that the verdict solved the conflict in favor of the plaintiff, we are justified in finding the facts as follows:

*Findings of Fact.*—Plaintiff was marshal of the city of Lockhart. There had been a jail delivery a short time before at Lockhart, and the deputy sheriff, J. M. Wright, son of the sheriff, had information that one of the escaped prisoners, who was under indictment for forgery, was in town and would probably go off on the train that night, and having business away, he, the deputy sheriff, requested Sanders to watch the train that night as he had to be absent from town on business. Sanders had one Van Flowers to go with him to watch the trains for the escaped prisoners; and about twelve o'clock at night they were at the depot of the San Antonio and Aransas Pass railroad on this business. The passenger train of defendant company left this depot to run to the defendant's depot. Sanders and Flowers got on the steps leading to the rear platform of the rear car, a Pullman car, to ride to the other depot and watch for the escaped prisoners, Flowers on the west side and Sanders on the east side. It was in proof that persons frequently rode on the trains from one depot to the other without molestation by the conductor or other employe of the defendant company.

The train stopped at a switch to switch onto the defendant's line, and then moved on towards the defendant's depot. Just after passing the switch and as the train was getting under headway the defendant's conductor came back to the rear end of the sleeper, having been informed by the Pullman conductor that some one was on the steps, and asked Sanders—he did not see Flowers—what he was doing there. Sanders replied, "nothing." The conductor used some "cuss words" and knocked or pushed Sanders off the steps, the train moving at the time some eight or ten miles an hour. Sanders' version of the matter is that "the conductor came to the door of the car and asked me what I was

·doing there—think he said 'what in the hell are you doing there?' I told him I was marshal of the city and was going to the 'Katy' depot. I was on the lookout for some parties. He said, 'By G—d, I am a deputy U. S. marshal.' At that time he pulled the bell cord. I started to look around the train north and he shoved me off. The train was running at the time I think nine or ten miles an hour. At no time during our conversation did the conductor ask me to go inside the car nor did he say anything about the rules and regulations to keep people from :riding on the platform or steps of the cars. He did not ask me for fare, nor did he ask me for a ticket. I had ridden from one depot to the ·other several times without a ticket or paying fare. The conductor saw me and made no objection. I was shoved from the car between the ·switch and the dirt road. I fell in a running position. It threw me back to the cattle guard. I fell into the ditch at the north end of the ·cattle guard, against the end of the timber. My chest and side struck against the timbers of the guard. My hand was skinned. My wrist was .sprained, my left leg, left side and breast and my face was scraped. For .about a week I could not use my right hand. My leg hurts me yet. I was in bed from it for about two weeks and after I got up it was some time before I could walk. I suffered from my chest and side for three or four weeks. It would hurt me in breathing. Van Flowers helped me to get up out of the cattle guard and carried me to Dr. Triggs and then home."

The train stopped after Sanders was pushed off, about forty yards from the place, and Flowers went back and found Sanders—and found him getting up out of the cattle guard. Flowers testified about Sanders complaining of hurts at the time,—pain below the knee, his right side, and shoulder,—and then testified as follows: "I started to town with him, but when he got about forty-five yards from where he was pushed off he complained very much of the pain and said he could not go any further. I then came over to Field's stable and got a carriage for him. When I came back he was this side of the board, about 110 or 115 yards from where he was thrown from the cars. I carried him to Dr. Trigg's house. I examined him and found a large bruised place on the leg between the knee and foot and a bruised place on his face. He did not seem to have the use of his arms; saw him try to use it as he got out of the carriage; supposed it was from the fall. After Dr. Trigg attended to his injuries I took him home. I had to help him from the ·carriage to his house."

Other witnesses testified that the train stopped only at the switch. Witnesses for the defendant testified that the conductor stopped the train after stopping at the switch, and put Sanders off the car, using no more force than was necessary to get him off, and that he was standing up when the train left him there. Dr. Triggs, who treated plaintiff, testified to his having found injuries on the leg. "Above and below the left knee was a bad bruise; his chest was bruised and his left side pained him very much he told me. There were bruises on the forehead and

some abrasions of the skin; his right wrist was sprained." The examination of the doctor was directly after the alleged injury. In answer to the question, "Was he in his right mind?" the doctor answered, "He did not seem to be quite himself; he seemed to be dazed. He was confined to his bed about ten days. I could not form any correct prognosis of the injuries that night; could not tell what the internal injuries might be. The next morning he was in his right mind and was suffering very much, so he told me. I did not find any bones broken. I also examined his chest. I could not find any wound of the legs, but I could not tell what the internal condition was."

Plaintiff used crutches awhile after he got up. The doctor treated him about ten days and told him he would charge him $50 if he got him up. Dr. Triggs testified further that he used liniments on the bruises, and that his injuries were mostly bruises. The foregoing are the main facts in substance,—except the conflicting testimony of defendants stated above,—which we find to be true in deference to the verdict. The testimony of defendant's witnesses tends to show that the conductor only used such force as was necessary to get the plaintiff off of the steps of the car and was careful in what he did; that plaintiff made a demonstration as if to draw a pistol when the conductor informed him that he must get off the car. This is denied by plaintiff, and the verdict settles the conflict in favor of plaintiff.

We find that the testimony supports the verdict as the case was submitted to the jury by the charge of the court. There is no complaint of the court's charge. The assignments of error addressed to the ruling of the court in refusing a new trial, because of the insufficiency of the testimony, cannot be sustained.

Appellant complains of the ruling of the court in permitting the witness, Sears, over objection of defendant, to testify as to the statement of the conductor several days after the ejection of the plaintiff, made to the witness, as to how the matter occurred, "that the conductor said to him at Luling, that Sanders got on the train, that he told him to get off, that Sanders refused and he knocked the d—d scoundrel off the train." This testimony was offered to impeach the conductor—he having denied that he made such a statement—and it was admissible as impeaching testimony. It was not error to permit the witness, Van Flowers, over defendant's objection, to testify that after he had gone about thirty-five yards from the place where Sanders was ejected from the train, that he, Sanders, complained to him very much of his injuries, and said he could not go any further, and requested him to go to town for a carriage."

It was decided by the Supreme Court in Railway v. Shafer, 54 Texas, 648, that such testimony is res gestae and admissible as such, tending to show the bodily condition of the plaintiff at the time of the expressions. "Whether they were real or feigned, was a question for the jury." The rule is well established that in a suit for bodily injuries suffered by plaintiff his expressions made at the place where he claims to have been hurt,

indicating pain, are admissible as res gestae.   Railway v. Barron, 78 Texas, 421.

There was no error in permitting Dr. Trigg, the attending physician of plaintiff, to testify that on the next day after the injuries plaintiff complained to him of pain in his chest, side and leg, and that his wrist hurt him.   The rule as to such testimony is laid down by Wharton in this language: "It is well settled that the character of an injury may be explained by exclamations of pain and terror at the time the injury is received, such declarations and explanations being part of the res gestae.   So when the nature of a party's sickness or hurt is in litigation, declarations to his physician or nurse during such sickness, his object being to explain his symptoms, may be received as part of the testimony and explanatory of the conclusions of such physician or nurse. Immediate groans and gestures, as indicating suffering, are, a fortiori, admissible.   But declarations as to present pain which are not instinctive, but are made when there has been an opportunity to think over the matter in reference to prospective litigation, are inadmissible when the declarations involve a statement of the cause of the injury; though when offered as instinctive indications of pain they are admissible to prove such pain, whenever at issue, no matter how long after the injury received.   Declarations to prove past pain have also been held admissible when made to a physician or nurse for the purpose of enabling him to form his opinion in the case.   Wharton on Ev., sec. 268.   The declarations made by plaintiff to his physician in this case were not made in connection with a statement of how the injury was received.   They do not appear to have been other than instinctive indications of existing pain, and under the rule stated were admissible.   No error is shown in admitting the testimony.

Finding that there was no reversible error presented in the assignments of error, we conclude that the judgment of the lower court ought to be affirmed, and it is so ordered.

*Affirmed.*

Delivered December 4, 1895.

Writ of error refused.