## NORWICH UNION INDEMNITY CO. v. SMITH et al. (Nos. 1139–5088.)

Commission of Appeals of Texas, Section A. Jan. 9, 1929.

See, also, 298 S. W. 403.

Spell, Naman & Penland, of Waco, for plaintiff in error.

Pat M. Neff and Joe W. Hale, both of Waco, for defendants in error.

NICKELS, J. Upon award of compensation as for injuries resulting in death of Homer Smith (husband of Mrs. Smith and father of the other claimants), Norwich Union Indemnity Company (insurer) brought suit to cancel. Mrs. Smith and (minor) daughters reconvened, all in accordance with terms of the Workmen's Compensation Law (article 8307, § 5, R. S. 1925). Judgment for compensation in a "lump sum" (article 8306, § 15, R. S. 1925) resulted; the insurer appealed, and the judgment was affirmed. 3 S.W.(2d) 120.

Writ of error was allowed upon asserted conflict of decisions touching subject-matter of assignments presented.

█ 1. Lucille Smith testified that her father "told her that he fell." This occurred, she said, "about forty or forty-five minutes * * * after he had been brought home." How much time was consumed in taking him home is not definitely shown.

Dr. Collins testified that Homer Smith told him (in giving history of his trouble) that "he suffered a fall." That statement was made to Dr. Collins "approximately six weeks after the occurrence" (i. e; the "fall").

Dr. Smith testified to a like statement made to him by Homer Smith some "eight weeks after the alleged injury."

Apparently, the inception of whatever injury in the course of employment Homer Smith received was a fall on a roof which he was painting. The testimony just detailed (and some yet to be mentioned) comprises the whole of the direct evidence on the matter of such a "fall."

The hearsay character of the testimony of Miss Smith and of Drs. Collins and Smith was duly raised and preserved and is the subject of assignments 1 to 4, inclusive.

Dr. Harrington, a physician who treated Homer Smith, testified for the indemnity company. He stated that he was called to see Smith "and found him in bed," whereupon Smith "told him he had had a fall and injured himself." According to Dr. Harrington, this happened "several days later than" February 12, 1925 (date of alleged injury)—"maybe, five or six days after that." This testimony was given on direct examination by counsel for indemnity company, and without objection made and preserved and without motion to strike or requested instruction for its nonconsideration by the jury.

Florio appeared as a witness for Mrs. Smith et al. Upon cross-examination it appeared that on May 5, 1925, he had signed a "statement" of the events of February 12th, etc. The "statement" was introduced by counsel for the indemnity company. It includes this declaration:

"About two weeks after that" (i. e., after a visit to Smith's house "about" February 15, 1925) "Smith came on the job across the street from the Proctor street job" (locus of the alleged injury) "and there mentioned he had slipped on wet paint on the roof and fell on a roof-jack on February 12th."

This evidence was not in any wise restricted, nor was its exclusion or restriction moved.

In our opinion the testimony of Dr. Harrington and the "statement" of Florio, in the record as it is, precludes reversal for error, if any, in the admission of the testimony of Miss Smith and of Drs. Collins and

560

Smith. Houston, E. & W. T. R. Co. v. Jackson (Tex. Com. App.) 299 S. W 885, 887, and cases there cited. And this renders immaterial consideration of the asserted conflicts between the decision by the Court of Civil Appeals here and decisions in Newman v. Dodson, 61 Tex. 91; Panhandle & Santa Fé R. Co. v. Huckabee (Tex. Civ. App.) 207 S. W. 329; M. K. & T. Ry. Co. v. Sanders, 12 Tex. Civ. App. 5, 33 S. W. 245, and M. K. & T. Ry. Co. v. Smith (Tex. Civ. App.) 82 S. W. 787.

■ 2. Lack of evidence of Homer Smith's death as a result of injury is the basis of the fifth assignment.

There is evidence to these points:

(a) Homer Smith, aged 63, was apparently in good general ·health on and for a long time prior to February 12th, 1925, his "health before this accident was all right; he was always able to work, and he hadn't been sick at any time before this accident in recent years; it had not been necessary to call a doctor to see him for any purpose; he had not ever missed a single day" (in work) "for years before * * * on account of his health."

(b) On February 12, 1925, he was engaged in his work of painting a roof, using therein a roof jack upon which he sat or stood. Florio was working inside the building. About 2 o'clock in the afternoon Smith called out for Florio. Florio went to Smith and found him "lying on his side with his elbow on the jack," or "lying on his side on the roof jack"; "he was lying down on his side propped up on his elbow." Smith appeared (to Florio) to be "hurting about his chest"; "he couldn't get his breath, and couldn't speak"; "he grabbed himself in the chest; the pain would be intense when he would go to talk, and he would catch his breath"; "he just crumpled over; * * * he grabbed his chest whenever that pain would strike him." Florio and Goss took Smith from the roof, helped him into an automobile, and Goss drove him to his (Smith's) home a mile, maybe, two miles, distant. During the trip it appeared to Goss that Mr. Smith was "suffering"; "he was out of breath mostly"; "he complained about this smothering feeling in his chest." Miss Smith thus described her father's condition:

"During the forty-five or fifty minutes that I speak of that intervened from the time he was brought home until he engaged in this conversation * * * his condition * * * as to pain and being able to talk was that he would just kind of hold on along here" (illustrating) "and lean over and he couldn't walk straight and couldn't stand up and couldn't get his breath and he couldn't talk very well."

(c) At locus of the "pain," as pointed out by Mr. Smith, there was "a pressed-in place," an area of the "breast" "just sunk in" as noticed by Miss Smith on February 13th. This was not seen by other members of the family at that time or by the physician who first treated Mr. Smith. Dr. Smith was called in several days later and found a "depression" "three or four inches in length," "about the width of one rib" ("the third or fourth rib possibly"), "in the right side" and "deep enough to be perceptible through the bandage." Dr. Smith called this to the attention of Gordon Smith; Gordon estimated depth of the depression at "three quarters of an inch or may be an inch below the level of the skin." An opinion of Dr. Smith is thus stated: "From that depression as I observed it, if this bone was left at that place a sufficient length of time, it would produce an irritation of the lung tissues between that and the rib, or could do it at least." He added: "The worst pain that Mr. Smith complained of in his body was this in his right chest, where that depression was." As noted, Dr. Harrington, who first treated Mr. Smith (maybe within an hour after he was brought home, maybe several days later) did not observe a "depression," but he does not remember whether Mr. Smith "was stripped entirely to his waist or not"; he remembers "baring the front part of his chest"; he "examined the chest with moderate care" and ordered it "bandaged" (on the first visit). According to Miss Smith's testimony, Dr. Harrington's first treatment consumed "about a minute," and consisted of "giving a hypodermic." Dr. Harrington says he first treated Mr. Smith for "traumatic pleurisy" due to "his fall," in view of Smith's statement that he "fell"; since Mr. Smith's condition did not improve, an X-ray examination was provided for by Dr. Harrington. The "pictures" were made by Dr. Collins and Dr. Harrington's examination of them revealed "some indication that possibly his rib had been fractured and the ends not separated. * * * There was a shadow there that indicated that possibly." But Dr. Harrington's opinion, after further study of the "pictures" and "examination of Mr. Smith," is "there was no fracture there— no recent fracture of his rib." Dr. Collins testified that his examination did not disclose a fracture or the "depression" noticed by Miss Smith (before that examination) and by Dr. Smith, Gordon Smith and others (after Dr. Collins' examination). And while Dr. Collins said (on direct examination by counsel for indemnity company) that he "stripped him off and examined him all over and examined his chest," on re-direct examination he said that Mr. Smith "was complaining of pain at the collar bone, * * * and I examined him there, which is above the nipple about two inches" (the "depression" mentioned having been "below the nipple").

(d) Mr. Smith's bad condition steadily progressed (he was "desperately sick," in Dr. Collins' opinion, at time of the examination just mentioned) until his death April 14, 1925. In progress of the condition hemorrhages developed.

(e) Dr. Collins thought Mr. Smith had "Bright's disease"; "enlarged heart"; arterial sclerosis"; pains from "calsified cartileges" near the right shoulder; "about half as much red blood cells as he ought to have had" (caused, probably, by "general toxemia from his gums and mouth"). Death, he thought, was attributable to "his human ailments, all of them, collectively and concurrently." Dr. Collins' views, in the main, had Dr. Harrington's concurrence.

(f) There was substantial agreement amongst the physicians on the point that a rib fractured or depressed, in the general manner described by Miss Smith, Dr. Smith, and others would be an adequate cause (or contributor to a cause) of death.

There is present, then: (a) Direct evidence of a fall, with direct or circumstantial evidence of its occurrence in course of employment; (b) direct evidence of immediately sequent pain in an area where a "depression" then or shortly afterward appeared in the body, with circumstantial evidence sufficient to warrant the jury in believing that the "depression" (or condition signified by it) was produced by impact of Mr. Smith's falling body, and, thus, to find essential connection between the "fall" and at least a substantial part of developed suffering.

And if "Bright's disease," etc., existed prior to the "fall" and made substantial contribution to death, those facts would not preclude a holding that death resulted from injury received in the "fall." Millers' Ind. Underwriters v. Schrieber (Tex. Civ. App.) 240 S. W. 963 (writ denied); Millers' Ind. Underwriters v. Heller (Tex. Civ. App.) 253 S. W. 853 (writ denied); Tex. Emp. Ins. Ass'n v. Jimenez (Tex. Civ. App.) 267 S. W. 752; Wiemert v. Boston El. R. Co., 216 Mass. 598, 104 N. E. 360; Brightman's Case, 220 Mass. 17, 107 N. E. 527, L. R. A. 1916A, 321; Clover, C. & Co. v. Hughes (1910) A. C. 242, 79 L. J. K. B. N. S. 470, 102 Law T. (N. S.) 340, 26 Times Law Rep. 359, 54 Sol. J. 375, 47 Scot. L. R. 885, 3 B. W. C. C. 275.

Accordingly, the fifth assignment must be overruled.

3. The indemnity company brought the suit with a petition in which was alleged: (a) The fact of an award (May 19, 1925) by the Industrial Accident Board "in the matter of Homer Smith, deceased," etc., requiring it (indemnity company) to pay Mrs. Smith and her two daughters compensation at the rate of $20 per week for 360 weeks, less sums already paid; (b) the fact of notice of its unwillingness to abide such award and with prayer that the award be vacated.

Upon trial of the case an agreement was made between the parties and stated in "open court" (apparently in presence of the jury) to the effect: (a) That Smith's employer carried workmen's compensation insurance, with the indemnity company as insurer, which was in effect on date of Smith's alleged injury and on date of his death; (b) that in due course "notice of injury and claim for compensation" account of Smith's death was made; (c) that the Industrial Accident Board thereupon made an award, with which the insurer was dissatisfied and for whose cancellation the suit was regularly brought by the insurer.

Amongst papers delivered to the jury upon its retirement was the petition mentioned. The indemnity company excepted to that action upon the ground that the pleading "contained matters that were not adduced in evidence." The sixth assignment is rested on that exception.

It is apparent that the agreement stated before the jury includes all of the "facts" of the "award" alleged in the petition except as to the amount of compensation allowed by the Industrial Accident Board. In so far as the jury may have considered the averments as to rate of compensation allowed by the board it was an effort to ascertain what rate should be allowed; and that "matter" (proper basis of compensation) was "adduced in evidence" by the indemnity company in showing that it had paid Mr. Smith compensation at the rate of $20 per week (the rate fixed in the award) for several weeks before his death. The exception as taken, therefore, is not supported by the record.

Reading of the petition (in whole) to or in presence of the jury is not negatived in the record. If it was thus read (and in deference to the judgment we are bound to infer it was), error (if any there was) in allowing the jury opportunity to read it must be regarded as harmless. Harmless character of the error, if any, is emphasized by presence of the evidence mentioned in the last paragraph above.

Hence the alleged conflict between the ruling of the Court of Civil Appeals here, on the one hand, and the rulings in Texas Emp. Ins. Ass'n v. Downing (Tex. Civ. App.) 218 S. W. 112, and in Millers' Ind. Underwriters v. Hughes (Tex. Civ. App.) 256 S. W. 334, on the other, does not exist, nor do those cases support the contention for reversible error.

4. In the remaining assignments (7 to 12, inclusive) error is claimed "in not sustaining objections" to various portions of argument of counsel. Assignments 7 and 8 are based on bill of exceptions No. 23. In the bill it is shown that the remarks stated in assignment 7 are but a part of a series of remarks to which (as a whole) objection was made, and that objection was not made to the remarks stated in assignment 8. We doubt that any of the argument disclosed in the bill is justly subject to the criticism made; but as, in the one instance, objection was made to the whole, of which the argument now reproduced is but a part, and as, in the other instance, no objection at all was made, it is manifest that we cannot sustain assertions of error in rulings of the court as ac-

tually made, in one event, and not made at all, in the other.

■ The ninth assignment presents claim of error of the judge "in not sustaining * * * objections * * * to the argument * * * that the law required only two witnesses to a fact and that a fact was established in any courthouse when testified to by two witnesses * * * because said statement was an incorrect statement of the law and the action of the trial court in overruling the objection was in effect a charge * * * to that effect." In its support was cited Panhandle & Santa Fé Ry. Co. v. Harp (Tex. Civ. App.) 199 S. W. 502, and Western Ind. Co. v. Corder (Tex. Civ. App.) 249 S. W. 316. In so far as there is requirement of law, a controverted "fact" must be established by some evidence; and, barring exceptional cases (of which this is not one), the testimony of one witness, credited by a jury, is sufficient. In one important sense, then, counsel suggested a greater burden for his client than that which the law imposed. And it is noticeable counsel did not say that as a matter of law a fact is established "when testified to by two witnesses." But if the argument be construed as counsel for plaintiff in error construes it, and if it be taken as embodying misstatement of law, there remains these considerations: (a) The court plainly instructed the jurors that they were "the exclusive judges of the facts proved, the credibility of the witnesses, and the weight to be given their testimony"; (b) the jurors knew that if the testimony of two witnesses would establish a "fact" the testimony of two opposing witnesses would disestablish it, accordingly as the one group or the other were credited, and that they were free to believe or disbelieve those of either group; (c) touching one matter of great importance defendants in error had but one witness, and on matters of defense plaintiff in error had two or more witnesses. In our opinion the argument, if improper, was not prejudicial to plaintiff in error.

■ Errors in the court's refusal to sustain objections to "argument directing the jury's attention to suffering and agony of Mr. Smith at time of the alleged injury," to "argument that the jury ought consider thoughts probably arising in Mr. Smith's mind and mental anguish probably suffered in thinking that he might never again cross the threshold of his home," and to argument that "here in the quietude of the courtroom * * * where money is involved it is easy to figure out what a person should have done to defeat a legitimate lawsuit—when the jingle of the dollar can be heard it is easy to theorize"—are the contentions, respectively, of assignments 10, 11, and 12. There was prejudice, it is said, in the first instance because suffering is not an element of damage (in a compensation case) and in the second and third because of the inflammatory nature of the argument.

The bill of exceptions discloses this argument, inclusive of the portions about which complaint is made:

"What is his condition when found there? Something happened. Smith says, 'I fell on the jack. I am suffering unto death.' They say it would be natural for him to say, 'I stepped on this wet paint a while ago when I went to move my paint bucket to go across the jack, and I miscalculated and there was a little wet paint there and I fell on it and hit the jack. I don't know exactly what it has done to me; it may have broken a rib.' Perhaps so. I don't know just how sick Mr. Smith was; I don't know just what agony he was going through. Not even the attorneys for the insurance company can know the agony he suffered in that hour. They sit in the quietude of the courtroom and say, 'Yes, the natural thing is to explain it to his laboring companions.' You don't know anything about it and I don't. Smith only knew the suffering he went through, and his companions say he did not say anything except just a word. They say he ought to have talked to them. Perhaps so. I think so, too, but I don't know anything about Homer Smith's condition. He may have been thinking of his cultured daughters, at home, his loving wife, for all I know. He may have been thinking, 'Shall I ever against go out of the door way of our home on Franklin Street?' Oh, here in the quietude of the courtroom, before a jury, where money is involved it is mighty easy to figure out what a person ought to have done, in order to defeat a ligitimate lawsuit. When the jingle of the dollar can be heard it is easy to theorize."

The argument as reproduced indicates for it the nature of a reply. Apparently, counsel for the insurer had stated the explanation which Mr. Smith "naturally" would have made (but did not make) immediately when "found" in agony by fellow workers.

There is evidence (some of which has been disclosed in another connection herein) of suffering on the part of Mr. Smith. And his suffering might reasonably account for failure to do what counsel apparently had argued he should have done. Opposing counsel had the right of reply, and we cannot say that the right was abused.

Accordingly, we recommend that the judgment of the Court of Civil Appeals be affirmed.

CURETON, C. J. Judgment of the Court of Civil Appeals affirmed, as recommended by the Commission of Appeals.