**INSURANCE COMPANY OF NORTH AMERICA, Petitioner,**

v.

**Howard MYERS et al., Respondents.**

No. A–11403.

Supreme Court of Texas.

Nov. 16, 1966.

Roberts, Smith, Roberts & Parker, Longview, for petitioner.

Jones, Jones & Baldwin, Jim Ammerman, with firm, Smith, Hall & Huffman, Marshall, for respondent.

STEAKLEY, Justice.

Jimmie L. Myers, wife and mother of the respondents, died on May 21, 1964, of a glioblastoma of the left frontal and parietal lobes, a malignant brain tumor. Suit was by respondents for benefits under the Workmen's Compensation Act because of her death. It was alleged that on July 1, 1963, the decedent suffered an injury in the course of her employment which caused an excitement and aggravation of the existing tumor condition and was a producing cause of her death. The jury so found, and additionally, that her death was not solely caused by the brain tumor. Judgment of the trial court in favor of respondents was affirmed by the court of civil appeals, 399 S.W.2d 932. We reverse the judgments below and render judgment for petitioner.

Mrs. Myers had a history of regular work for several years in the employment of Blue Buckle Overall Company of Marshall, Texas. Her medical facts were shown to be these. On December 18, 1962, she blacked out at her home and was attended by Dr. Robert Koenig who referred her to Dr. Philip Bonn, a neurosurgeon. She was de-

scribed to this doctor as having suffered tremors to the upper and lower extremities and to have suffered severe headaches. The findings of the doctor were negative as to the source of her trouble. Subsequently on February 5, 1963, Mrs. Myers was again seen by Dr. Koenig at which time she was complaining of pain in the neck and shoulders; it also appears that a history of a whiplash injury some three years before was then obtained. Two days later, Dr. Koenig saw Mrs. Myers in the emergency room of the hospital following a convulsive seizure and again referred her to Dr. Bonn. Dr. Bonn saw her again on March 12 and on May 24, 1963, at which times she was complaining of blurred vision, dizziness and some difficulty in walking. The doctor attributed such symptoms to the medicine and made a change in dosage. Neither Dr. Koenig nor Dr. Bonn had diagnosed her condition as a malignant brain tumor, although both testified they regarded her as a tumor suspect during this time.

The injury which respondents contend "triggered or aggravated or accelerated the growth of the brain tumor" occurred on July 1, 1963. Mrs. Myers momentarily grabbed a bundle of clothes weighing approximately 140 pounds which unexpectedly fell toward her while she was sitting at the machine she was operating for her employer. It is respondents' theory that this caused her body to be jerked violently in the area of her head and neck in a "whiplash fashion." She was referred to Dr. Orin Littlejohn, a company doctor, on July 6; he testified that she had received a cervical sprain described as a condition of some tearing or excessive strain on the ligaments of the neck. Later, during the period of August 3 to 10, she was hospitalized in cervical traction and given muscle relaxants, medicine for pain and physical therapy. Thereafter on August 26 Dr. Littlejohn referred the patient to Dr. L. A. Colquitt, an orthopedic specialist, for examination of the cervical sprain. Mrs. Myers was again seen by Dr. Bonn on September 13 and 20 and was hospitalized from September 22 until October 2. She was seen by a Dr. Snodgrass of Galveston on November 11 and on November 19 entered the hospital in Shreveport for surgical removal of the tumor. On November 20, the operation was performed and the existence of the malignancy was established. The condition of Mrs. Myers steadily worsened until her death on May 21, 1964.

Drs. Bonn, Littlejohn and Colquitt testified that a cervical sprain injury such as that suffered by Mrs. Myers would not, in reasonable medical probability, excite or aggravate the malignant brain tumor causing her death.

The testimony of a fourth doctor, Dr. Antonio Dieste, a surgeon also engaged in general practice in Marshall, was presented by respondents. He attended Mrs. Myers from January 1, 1964, approximately six weeks after removal of the tumor, until her death. He testified in response to a hypothetical question that it was "reasonably probable that the injury she sustained *could have** aggravated the tumor, and become an exciting or concurring cause, so that it was one of the causes, to whatever degree, of the death of Jimmie Myers." The following colloquy thereafter occurred on cross examination:

\* \* \*

Q. All right sir. Then, Doctor, if that is the case, a lifting such as—not a lifting excuse me, a grabbing of a bundle by a patient such as Jimmie Lee Myers would not have been an aggravating circumstance of a glioblastoma?

A. It *could have*, in the terms that I have already discussed. That's the only way it could have been——

Q. You say it could have. You are putting it on a possibility, is that right sir?

A. It is one of the many probabilities in that long list that they talked about there.

---

* The italics throughout are added.

\* \* \* \* \* \*

A. Well, the reason I say yes is because he asked me about a severe injury. I was not there when the injury occurred, I do not know how the injury occurred in detail, or how severe it was, I can not testify as to that. He asked me, assuming that it was a severe injury; my answer was yes.

Q. All right, sir. Now, by severe injury, then you predicated it, Doctor, on the fact that it was a severe injury of that type?

A. Yes, sir.

\* \* \* \* \* \*

Q. All right, sir. Now, Doctor, by aggravating, are you stating that this glioblastoma was in a capsule, and she reached and got a bundle and it broke this capsule?

A. I did not—I do not remember saying that.

\* \* ·\* \* \* \*

A. We don't even know if there was a capsule there. I don't know if there was a capsule there. I couldn't tell you any more than if I had one myself right now. They were asking me questions in general about tumors, and about possibilities. That would be one of many possible ways in which a tumor could be aggravated. Now, how probable it is in this case, I don't know the exact mechanism by which it was aggravated. I could not possibly know.

Q. Well, it was my understanding, Doctor, maybe I was wrong, that these four or five possibilities he went through, ultimately, if any of those things happened, the effect of it was that it was a rupture of the tumor.

\* \* \* \* \* \*

A. I take it you are asking me if that was the specific way in which it happened to Mrs. Myers?

Q. Yes.

A. I don't know it, and I don't know of anyone who knows if that was the specific way in which it happened. That was a probable way.

Q. Then the aggravation that you have testified about, you are not stating the aggravation was because it ruptured a membrane enclosing this glioblastoma?

A. Not necessarily through that mechanism alone. I don't know which one of the mechanisms of the possible ways that it can happen did happen in this case. I am sure it is obvious to you that I don't know.

Q. And, any whiplash she may have received of her neck had nothing to do with the cause of her death, did it doctor?

A. No, that would be changing completely what I have said.

Q. Well, I am asking the question, can you answer it?

A. Yes, I can answer it.

Q. What was the answer?

A. I just finished saying the opposite, when you asked me that, it confuses me. My testimony that, *assuming that she had the kind of injury that they said she received, an aggravation could have resulted to this tumor, that is my testimony.*

■ It was thus shown that Mrs. Myers was injured on July 1, 1963, while in the scope of her employment. There is evidence that this was an injury of some severity. It was also established and appears not to have been disputed, that she died as the result of a malignant brain tumor which pre-existed the injury. Workmen compensation benefits are recoverable notwithstanding such condition if there was shown a causal relation between the injury and death, *i. e.,* the cervical sprain injury suffered by Mrs. Myers excited, aggravated and activated the existing tumor condition and was a contributing or producing cause of death. Texas State Hwy. Dept. v. Fillmon, 150 Tex. 460,

242 S.W.2d 172 (1951); Garcia v. Texas Indem. Ins. Co., 146 Tex. 413, 209 S.W.2d 333 (1948); Texas Indem. Ins. Co. v. Staggs, 134 Tex. 318, 134 S.W.2d 1026 (1940); Guzman v. Maryland Casualty Co., 130 Tex. 62, 107 S.W.2d 356 (1937); Texas Employers' Ins. Ass'n v. Parr, 30 S.W.2d 305 (Tex.Com.App.1930, jdgmt. adopted); Norwich Union Indemnity Co. v. Smith, 12 S.W.2d 558 (Tex.Com.App.1929, jdgmt. adopted).

The causal base of cancer and the theory of its traumatic aggravation are subjects of dispute in the medical profession. The testimony of the medical witness in the reported cases has been couched in varying terms of "could have," "might be," "probably aggravated," "did cause," "a reasonable assumption," "might reasonably be the cause," and so on. See Markus, Semantics of Traumatic Causation, 12 Cleveland-Marshall L. Review 233 (1963). It has been said, "Even today * * * the doctor's cause is little more than the doctor's conjecture." Small, Gaffing at a Thing Called Cause: Medico-Legal Conflicts in the Concept of Causation, 31 Tex.L.Rev. 630, 632–633 (1953). And see Annot., 2 A.L.R.3d 384 (1965). The problem in workmen's compensation cases has been considered by the courts of this and other jurisdictions under varying factual circumstances and shades of medical testimony. See Jacoby v. Texas Employers' Ins. Ass'n, 318 S.W.2d 921 (Tex.Civ.App.—San Antonio 1958, writ ref'd n. r. e.); Scott v. Liberty Mut. Ins. Co., 204 S.W.2d 16 (Tex.Civ.App.—Austin 1947, writ ref'd n. r. e.); Trinity Universal Ins. Co. v. Walker, 203 S.W.2d 308 (Tex. Civ.App.—Austin 1947, writ ref'd n. r. e.) and Traders and General Ins. Co. v. Turner, 149 S.W.2d 593 (Tex.Civ.App.—Fort Worth 1941, writ dism'd jdgmt. cor.); Travelers Ins. Co. v. Rowand, 197 F.2d 283 (5th Cir.1952); Macon County Coal Co. v. Indus. Comm'n, 374 Ill. 219, 29 N.E.2d 87 (1940); Custer v. Higgins Indus., Inc., 24 So.2d 511 (La.App.1946); Sullivan's Case, 345 Mass. 762, 186 N.E.2d 601 (1962); Luczek's Case, 335 Mass. 675, 141 N.E.2d 526 (1957); Murphy's Case, 328 Mass. 301, 103 N.E.2d 267, 269 (1952); Russo v. Wright Aeronautical Corp., 137 N.J.L. 346, 60 A.2d 263, 264 (1948); Parella v. Harrod Steel Erection Co., Inc., 19 A.D.2d 451, 243 N.Y.S.2d 982 (1963); Mattfield v. Ward Baking Co., 14 A.D.2d 942, 221 N.Y.S.2d 224, 225 (1961); Lefkowitz v. Silverstein, 11 A.D.2d 841, 203 N.Y.S.2d 122, 124 (1960). Many of these as well as additional cases involving cancer are cited in 1 Larson's Workmen's Compensation Law § 12.20 n. 43 (1961).

■ Other than with the possible exception of the reasoning of the court in *Walker* respecting cancer aggravation, we have found no case in which lay testimony and the factual circumstances of an injury, together with expert testimony clearly limited to medical possibilities, have been held sufficient to support an inference that a pre-existing tumor was activated and the deadly effects of a malignancy accelerated by an injury. It is our view that such occurrence, or not, is a question of science determinable only from the testimony of expert medical professionals. See American Casualty and Life Co. v. Gueringer, 205 S.W.2d 423 (Tex.Civ.App.—San Antonio 1947, no writ). Causal connection in such a fact situation must rest in reasonable probabilities; otherwise, the inference that such actually did occur can be no more than speculation and conjecture. Whitten v. Liberty Mutual Ins. Co., 257 F.2d 699 (5th Cir. 1958). Reasonable probability, in turn, is determinable by consideration of the substance of the testimony of the expert witness and does not turn on semantics or on the use by the witness of any particular term or phrase. We have established the rule of reasonable probability in analogous situations. Expert medical testimony predictive of what will happen in the future from a present injury is confined to reasonable medical probabilities, *i. e.*, results reasonably to be anticipated. Houston & T. C. Ry. Co. v. Fox, 106 Tex. 317, 166 S.W. 693 (1914); Galveston, H. & S. A. Ry. Co. v. Powers, 101 Tex. 161, 105 S.W.

491 (1907); Lentz v. City of Dallas, 96 Tex. 258, 72 S.W. 59 (1903); Gulf, C. & S. F. Ry. Co. v. Harriett, 80 Tex. 73, 15 S.W. 556 (1891). Proof of want of skill in malpractice suits must establish causal connection beyond the point of possibility by expert professional testimony. Porter v. Puryear, 153 Tex. 82, 262 S.W.2d 933, 264 S.W.2d 689 (1954); Bowles v. Bourdon, 148 Tex. 1, 219 S.W.2d 779, 13 A.L.R.2d 1 (1949). A hospital record carrying a diagnostic entry is admissible under 3737e, Vernon's Annotated Texas Civil Statutes, only when it records a condition resting in reasonable medical certainty. Loper v. Andrews, 404 S.W.2d 300 (Tex.1966). *Cf.* also Travelers Ins. Co. v. Blazier, 228 S.W.2d 217 (Tex.Civ.App.—Fort Worth 1950, writ dism'd); Lumbermen's Mut. Cas. Co. v. Vaughn, 174 S.W.2d 1001 (Tex.Civ.App.—Fort Worth 1943, no writ).

We note as not controlling here those decisions in workmen's compensation cases in medical situations not involving the highly uncertain medical problem of the nature, origin and aggravation of cancer. See Maston v. Texas Employer's Ins. Ass'n, 160 Tex. 439, 331 S.W.2d 907 (1960); Carter v. Travelers Ins. Co., 132 Tex. 288, 120 S.W.2d 581 (1938); Norwich Union Indemnity Co. v. Smith, 12 S.W.2d 558 (Tex. Com.App.1929, jdgmt. adopted); Aetna Ins. Co. v. Hart, 315 S.W.2d 169 (Tex.Civ.App. —Houston 1958, writ ref'd n. r. e.); American General Ins. Co. v. Barrett, 300 S.W. 2d 358 (Tex.Civ.App.—Texarkana 1957, writ ref'd n. r. e.); Atkinson v. United States Fidelity and Guaranty Co., 235 S.W. 2d 509 (Tex.Civ.App.—San Antonio 1951, writ ref'd n. r. e.); Associated Employers Lloyds v. Self, 192 S.W.2d 902 (Tex.Civ. App.—Dallas 1946, writ ref'd n. r. e.); Galveston, H. & S. A. Ry. Co. v. Harris, 172 S.W. 1129 (Tex.Civ.App.—San Antonio 1915, writ ref'd).

■ Here, the only medical testimony supportive of the jury finding that the injury suffered by Mrs. Myers was a producing cause of her death from cancer was the testimony of Dr. Dieste. A review of all he said in the context of the questions propounded establishes that Dr. Dieste did no more than express the medical possibility that the injury caused an aggravation or excitement of the pre-existing brain tumor in one of several possible ways and hence could have been a concurring or contributing cause of death. He himself summarized his testimony by saying that an aggravation "could have resulted to this tumor." Dr. Dieste did not state as his medical opinion that the injury did in fact, or in reasonable medical probability, aggravate or excite the pre-existing tumor; he stated only the medical possibility that such could have occurred. The nature of the injury suffered by Mrs. Myers and her death over ten months later from a pre-existing brain tumor, particularly in the light of her medical history, is not of sufficient probative force to support the inference of fact that the injury was a concurring, contributing or producing cause of her death. This is likewise true of the testimony of Dr. Dieste. In this state of the record causal connection is left to surmise or conjecture with the fact finder having to make an arbitrary choice between unproved conclusions. Cf. Western Telephone Corp. of Texas v. McCann, 128 Tex. 582, 99 S.W.2d 895 (1937).

The judgments of the court of civil appeals and the trial court are reversed and judgment is here rendered for petitioner.