**BURROUGHS WELLCOME
COMPANY, Petitioner,**

v.

**Robert N. CRYE, Independent Executor
of the Estate of Jewell K. Crye,
Respondent.**

No. 94–0792.

Supreme Court of Texas.

Argued Feb. 7, 1995.

Decided June 15, 1995.

Perfection was timely whether 30 or 90 days is    the proper allotment of time.

James L. Gallagher, Joseph L. Hood, Jr., Jeffrey S. Alley, Eric M. Brittain, El Paso, for petitioner.

Joel Fry, El Paso, for respondent.

SPECTOR, Justice, delivered the opinion of the Court, in which PHILLIPS, Chief Justice, HIGHTOWER, CORNYN, GAMMAGE and ENOCH, Justices, join.

We consider whether, under the facts of this case, there is any evidence of causation to support a products liability judgment against Burroughs Wellcome Company. The court of appeals held that the jury's finding of producing cause is supported by legally sufficient evidence. —— S.W.2d ——. We hold that there is no evidence establishing that Jewell K. Crye suffered a frostbite injury as a result of using the product at issue, Polysporin® spray. Therefore, we reverse the judgment of the court of appeals and render judgment that Robert N. Crye, as Independent Executor of the Estate of Jewell K. Crye, take nothing.

This suit arose when Jewell K. Crye sought treatment for ulcers on her feet that were caused by diabetes. Such ulcers create a portal of entry for infection. Dr. Peter Herman, a dermatologist, recommended to Crye that she use Polysporin in the powder form for treatment of fungal infections on her feet. Instead, Crye purchased a can of Polysporin spray, which is manufactured by Burroughs Wellcome Company and available over the counter. Polysporin spray is an antibiotic powder that is applied by an aerosol spray using freon as its propellant.

Crye applied Polysporin spray to her foot for the first and only time on or about March 4, 1987. Her foot became red and swollen following application of the spray. Crye visited Dr. Herman on March 6, 1987, and gave a history of having used Polysporin spray. Dr. Herman noted swelling of the first and second toes and foot ulcers. He diagnosed the problem as an infection of the left first toe web, the area of skin between the big toe and the adjacent toe. Dr. Herman, who frequently treats diabetics, prescribed medication for the infection, including antibacterial, antifungal and anti-yeast soaks, creams for ulcers, and antibiotics.

Crye returned to Dr. Herman on March 13. At this time, Dr. Herman recommended hospitalization because the ulcers had not healed, and this condition created the potential for ongoing infection, which could lead to skin necrosis, larger ulcers, and possible foot amputation.

Instead of entering the hospital, on March 16, 1987, Crye visited Dr. Cornelius Blesius, her long-time primary care physician. Dr. Blesius diagnosed Crye's foot condition as frostbite. He based this diagnosis on the lack of redness on the foot and on a small piece of dead skin in the web of her foot next to the big toe. Dr. Blesius referred Crye to a podiatrist, Dr. Errol Schoenbrun. Shortly thereafter, Crye was hospitalized. Crye's infection was controlled during her hospitalization without amputation, but she was never able to walk unaided again.

Crye brought this products liability action against Burroughs Wellcome Company, alleging design and marketing defects, negligence, and breach of warranty. The jury found that design and marketing defects in Polysporin spray were a producing cause of Crye's injuries. The jury also found that Burroughs was negligent, that the spray was unfit for the ordinary purposes for which such sprays are used, and that both Burroughs' negligence and the unfit condition of the spray proximately caused Crye's injuries. The trial court granted Burroughs' motion for judgment notwithstanding the verdict as to design defect, but rendered judgment for Robert N. Crye, as Independent Executor of the Estate of Jewell K. Crye, based on the remainder of the claims.[1] The court of appeals affirmed.

■ In reviewing a claim of legal insufficiency of the evidence, this Court considers only the evidence and inferences that tend to support the jury's finding and disregards all evidence and inferences to the contrary. *Davis v. City of San Antonio*, 752 S.W.2d 518, 522 (Tex.1988); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). A jury's finding will be upheld if more than a scintilla of evidence supports it. *Stafford v. Stafford*, 726 S.W.2d 14, 16 (Tex.1987). More than a scintilla of evidence exists where the evidence supporting the finding, as a whole, "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex.1994).

■ To establish causation in a personal injury case, a plaintiff must prove that the conduct of the defendant caused an event and that this event caused the plaintiff to suffer compensable injuries. *Morgan v. Compugraphic Corp.*, 675 S.W.2d 729, 731 (Tex. 1984). The issue in this cause is whether there is more than a scintilla of evidence that supports a causal nexus between the event sued upon—the use of Polysporin spray in the absence of adequate warnings and instructions in the packaging and labeling of the spray—and Crye's injuries.

■ Frostbite is the only injury for which Crye alleges Burroughs failed to provide warnings and instructions. The nature of a frostbite injury is such that expert medical testimony is required to establish causation. *Cf. Insurance Co. of North Am. v. Myers*, 411 S.W.2d 710, 713 (Tex.1966).

The evidence offered in support of Crye's claim that she suffered a frostbite injury as a result of using the Polysporin spray consists of the expert opinion of Dr. Blesius, factual testimony concerning the progression of Crye's injuries, and hospital and other medical records. We now turn to a review of the legal sufficiency of this evidence.

Dr. Blesius testified that Polysporin spray caused Crye to suffer from frostbite. Dr. Blesius based this opinion on the assumptions (1) that there was no redness on Crye's foot after the spray was applied; and (2) that Crye did not apply the spray as directed by the product labeling and instructions. Dr. Blesius stated that if Crye's foot was red after the spray was applied, then his diagnosis would have been different. He explained that redness is consistent with Dr. Herman's diagnosis of infection. Dr. Blesius also testified that if Crye followed the product labeling and instructions, then she probably did not suffer a frostbite injury.

Jewell Crye testified in a deposition and her husband testified at trial that Crye's foot was red after the spray was applied. No witness testified and no evidence was offered to the contrary. Furthermore, Crye testified that she applied the spray as directed. Once again, there is no evidence to the contrary.

■ We hold that Dr. Blesius' testimony constitutes no evidence that Polysporin spray caused Crye to sustain a frostbite injury. When an expert's opinion is based on assumed facts that vary materially from the actual, undisputed facts, the opinion is without probative value and cannot support a verdict or judgment. *See Schaefer v. Texas Employers' Ins. Ass'n*, 612 S.W.2d 199, 202–05 (Tex.1980) (reviewing substance of medi-

---

1. Robert N. Crye, Jewell K. Crye's husband, proceeded as plaintiff/appellee/respondent as the Independent Executor of the Estate of Jewell K. Crye following her death, which occurred before trial and was unrelated to the use of Polysporin spray.

cal expert's testimony and holding that this testimony constitutes no evidence of causation, as it is based on assumptions, possibility, speculation, and surmise); 32 C.J.S. *Evidence* § 569(4)(c) (1964).

Both Jewell and Robert Crye testified regarding the sequence of events surrounding the spraying of Crye's foot. They stated that Crye's foot became red and swollen after she applied the Polysporin spray to it. They observed that the spray caused a condition different from the sores and ulcers that they had previously associated with Crye's diabetic condition. However, their own expert, Dr. Blesius, testified that if Crye's foot was red following the spraying, then she probably did not suffer from frostbite. Consequently, the lay testimony of the Cryes constitutes no evidence that Crye sustained a frostbite injury as a result of using the Polysporin spray.

■ Crye's medical records also do not constitute evidence that using the Polysporin spray caused Crye to suffer a frostbite injury. Crye's admission records to Southwestern General Hospital contain an admitting diagnosis of frostbite, and frostbite is discussed, and at times linked to the use of an antibiotic spray,[2] in various other medical records.

■ The diagnoses contained in Crye's medical and hospital records are admissible. TEX.R.CIV.EVID. 803(6). However, to constitute evidence of causation, an expert opinion must rest in reasonable medical probability. *Insurance Co. of North Am. v. Myers*, 411 S.W.2d 710, 713 (Tex.1966). This rule applies whether the opinion is expressed in testimony or in a medical record, as the need to avoid opinions based on speculation and conjecture is identical in both situations. *See* Wendorf, *The 1984 Texas Rules of Evidence Amendments*, 37 BAYLOR L.REV. 81, 102–03 (1985); *see also Hooper v. Torres*, 790 S.W.2d 757, 760 (Tex.App.—El Paso 1990, writ denied). Reasonable probability is determined by the substance and context of the

opinion, and does not turn on semantics or on the use of a particular term or phrase. *Myers*, 411 S.W.2d at 713.

The context of the opinions contained in the medical records does not indicate that these opinions are independent conclusions that Crye developed frostbite as a result of using the Polysporin spray. Rather, the context indicates that these statements are merely recitations of medical history or opinion as to causation provided by other records, Crye, or Dr. Blesius. When reviewing legal sufficiency of the evidence, we will make reasonable inferences in favor of the jury's findings. However, given the nature of these records and the nature of a frostbite injury, it is unreasonable to assume that the records contain expert opinions that, in reasonable medical probability, the use of Polysporin spray caused Crye to suffer a frostbite injury.

We do not reach the issue of the admissibility of Dr. Fuentes' "pig's foot" study, which is discussed extensively in the concurring opinion, because our holding on causation disposes of all of Crye's claims before this Court.[3] We note, however, that the study does not constitute evidence of causation. Dr. Fuentes' study was admitted into evidence for the limited purpose of comparing the cooling effect of Polysporin spray with that of other sprays, and the trial court instructed the jury accordingly.

We hold that there is no evidence that Crye sustained a frostbite injury as a result of using Polysporin spray. We therefore reverse the judgment of the court of appeals and render judgment that Robert N. Crye, as Independent Executor of the Estate of Jewell K. Crye, take nothing.

GONZALEZ, Justice, joined by HECHT and OWEN, Justices, concurring.

Because there is no evidence that the use of Polysporin spray caused Mrs. Crye to suffer a frostbite injury, I concur in the

---

2. For example, in handwritten notes dated March 27, 1987, Dr. Schoenbrun wrote that Crye "developed frostbite due to propellant and improper use of spray can—was seen by her family physician Dr. Blesius who referred her to me."

3. We do not reach the remaining challenges to the legal sufficiency of the evidence and the damage award for the same reason.

Court's judgment. However, I believe the trial court abused its discretion by admitting into evidence Dr. H.R. Fuentes's "pig's foot" study in violation of Rules 403 and 702 of the Texas Rules of Civil Evidence.

This case arose when Jewell Crye sustained permanent foot injuries, allegedly from frostbite caused by the application of Polysporin antibiotic spray. Mrs. Crye brought a products liability action against Burroughs Wellcome Company, the manufacturer of Polysporin, alleging design and marketing defects, negligence, and breach of warranty. In support of her design defects claim, Mrs. Crye offered the report of a study conducted at the request of her attorney and Dr. H.R. Fuentes's related deposition testimony to show that Polysporin spray, in comparison with other sprays, causes a substantial *skin* temperature reduction.

Sunder Pappu, a graduate research assistant at the University of Texas at El Paso, conducted a study under the direction of Dr. Fuentes, a civil engineering professor. The study compared the cooling effects of five commercially available antibiotic sprays, including Polysporin. In the study, Pappu applied the sprays to dead pigs' feet from various distances, for different periods of time, and at two different angles. In order to measure the decrease in temperature as a function of depth from the surface of the skin, Pappu placed one thermocouple, a metal device that measures temperature, on the pigs' feet at the surface of the skin and inserted two thermocouples at different depths below the surface of the skin. He then compared the temperature decreases the sprays caused. The report of the study concluded that Polysporin spray caused a greater temperature reduction than any of the other sprays tested. However, the report also stated that the results of the study could not be directly extrapolated to human skin.

Burroughs objected to the admission of the report and Dr. Fuentes's related testimony on the grounds that they were not relevant or helpful to the trier of fact, that Dr. Fuentes's methodology was not appropriate because it was not recognized by members of the medical field, and that the probative value of the report would be outweighed by its prejudicial effect. The trial judge overruled Burroughs's objections and admitted the report of the "pig's foot" study and Dr. Fuentes's testimony. On appeal, Burroughs argued that the trial court abused its discretion by admitting the report and testimony. The court of appeals held that the trial court did not err in admitting the evidence, concluding that "the comparative discrepancies between Mrs. Crye's use of the product and Dr. Fuentes' pig's foot study were clearly explained to the jury. Such discrepancies go to the credibility and the weight to be given by the jury to Dr. Fuentes' testimony and experiment and not to its admissibility." ——— S.W.2d ———, ———. The court further held that even if the trial court improperly admitted the evidence, any error was harmless because the outcome of the case did not turn on the report and Dr. Fuentes's testimony. *Id.* at ———.

Rule 702, which governs the admission of expert testimony, states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Tex.R.Civ.Evid. 702. In *E.I. du Pont de Nemours & Co. v. Robinson*, ——— S.W.2d ——— [1995 WL 359024] (Tex.1995), we addressed the standard trial courts should employ when determining whether expert testimony is admissible under Rule 702. Under this standard, expert evidence must be both relevant to a fact issue in the case and based on a reliable technique or theory to be admissible. *Id.* at ———. Applying this standard to the facts of this case, I would hold that the trial court abused its discretion by admitting the report and Dr. Fuentes's related testimony into evidence.

The expert evidence in this case was not based on a scientifically reliable technique. On cross examination, Dr. Fuentes admitted that because Pappu had poorly recorded the test results, it was possible that the results were incorrect. When questioned about Pappu's failure to either make or record critical temperature readings, Dr. Fuentes agreed

that Pappu's work could be characterized as "real sloppy investigative work." He also stated that he was "feeling ashamed" of his lack of knowledge regarding the raw data and that some of the raw data was not well documented. Dr. Fuentes further admitted that the temperature readings at the surface of the pigs' feet *actually measured the temperature of the metal thermocouples* because the sprays were applied directly to the thermocouples on the surface of the skin. Dr. Fuentes agreed that as a result, Pappu probably did not obtain an accurate measurement of the temperature of the pigs' feet at the surface, and that the temperature decrease in the metal thermocouples resulting from direct application of the sprays was probably more dramatic than the temperature decrease in the skin of the pigs' feet.

Other factors also indicate that the report of the "pig's foot" study and Dr. Fuentes's related testimony were not based on scientifically reliable methodology. One factor is that Dr. Fuentes conducted the study for the purpose of testifying in Mrs. Crye's suit against Burroughs. *See Robinson,* —— S.W.2d at —— (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1317 (9th Cir.1995) (upon remand)). Research conducted for the purpose of litigation is not automatically rendered unreliable. *Id.* at ——. However, findings based on research conducted independently of litigation are "less likely to have been biased toward a particular conclusion by the promise of remuneration." *Daubert,* 43 F.3d at 1317. Another factor suggesting that Dr. Fuentes's methodology was not scientifically reliable is that his study was not subjected to peer review or publication. *See Robinson,* —— S.W.2d at ——. Peer review and publication increase the likelihood that any weaknesses in the methodology will be exposed, and provide an indication that the expert's research meets some minimal criteria of good science. *Daubert,* 43 F.3d at 1318.

Another ground on which the trial court could have excluded the report and Dr. Fuentes's testimony is Rule 403, which states:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.

Tex.R.Civ.Evid. 403. In this case, the probative value of the report of the "pig's foot" study and Dr. Fuentes's testimony, if any, was outweighed by the dangers of unfair prejudice, confusion of the issues, and misleading the jury.

A critical issue in this case affecting all of Mrs. Crye's theories of liability was whether the application of Polysporin caused her to suffer frostbite. The jury could have interpreted Dr. Fuentes's opinion that Polysporin caused a greater *skin* temperature reduction than any other spray, *sometimes to temperatures below freezing,* as evidence that Polysporin spray caused frostbite in Mrs. Crye's foot. Thus, the jury may well have viewed Dr. Fuentes's report and testimony as evidence in support of Mrs. Crye's other claims. Because the probative value of the report and related testimony was substantially outweighed by the danger of unfairly prejudicing the jury's determination of Burroughs's liability as to Mrs. Crye's other claims, the evidence should have been excluded under Rule 403.

In sum, Dr. Fuentes's methodology was unreliable, and the probative value of his report and related testimony was substantially outweighed by the dangers of unfair prejudice, confusion of the issues, and misleading the jury. Accordingly, I would hold that the trial court abused its discretion by admitting into evidence the report of the "pig's foot" study and Dr. Fuentes's related testimony.