# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-03-00234-CV

Timothy Kirk Colvin, Appellant

v.

Christine Renee Colvin, Appellee

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT
NO. FM1-05513, HONORABLE DARLENE BYRNE, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

The district court granted Christine Renee Colvin ("Vickrey")[1] a protective order against Timothy Kirk Colvin after their divorce. Finding that Colvin had committed family violence and that there was a potential for more violence, the district court restricted Colvin's contact and communication with Vickrey and their child. Colvin contends that the district court erred by granting the protective order because Vickrey's petition was deficient, res judicata should have prevented the court from admitting evidence of pre-divorce events, and the evidence was insufficient to support the court's finding of past and future family violence. We will affirm the judgment.

---

[1] In district court documents, including the protective order, appellee's last name is "Colvin." In her appellate brief, however, she uses the last name "Vickrey"—her new married name. Because no one has requested that we change the style of the case, we will refer to appellee as "Colvin" in the style of the case and in the judgment. For ease in distinguishing the parties in the body of the opinion, however, we will refer to appellee as "Vickrey" and reserve "Colvin" for appellant.

**BACKGROUND**

In 1999, Vickrey and Colvin had a son ('the child"). Vickrey and Colvin were divorced in March 2002. The court appointed them joint managing conservators, with Vickrey having the right to designate the child's primary residence and Colvin having standard possession.

In November 2002, Vickrey moved to modify the possession order and sought a temporary restraining order and a protective order. The application for protective order did not have a copy of the final divorce decree attached or a statement that the decree was unavailable but would be filed before the hearing. An associate judge granted the application. Colvin appealed to the district court, which held a de novo bench trial.

Over Colvin's running res-judicata objection, discussed below, Vickrey introduced evidence of threats and altercations occurring during their marriage. Vickrey's father, John Zizelman, testified about seeing the aftermath of a dispute between Vickrey and Colvin at his lake house in August 2001. Zizelman saw two legs broken off of an end table, two legs bent on a sofa, wires hanging out of a wall where a portable phone base had been plugged in (he found the phone base elsewhere), blood splattered over a bathroom door and bedroom door, and a bedroom door that had been forced open. He testified that Colvin later called threatening to rip out the computers he had installed at the family-owned school that the child attended; at the time, Colvin owned 49% of the stock in the corporation running the school and was on the board of directors. Instead, Colvin broke into the school office (the locks had been changed weeks before), removed some checks, and cashed one; although he was named on the account, the accounts were for business purposes.

Zizelman testified that, although 95% of his discussions with Colvin were calm and rational, in the other 5% "things just go off the wall." In such a state, Colvin spoke with lots of

obscenities and would call repeatedly—usually at least six times and sometimes more than twenty. Zizelman estimated that he had approximately twenty such outbursts of conversations with Colvin before the divorce and about eight to ten in the nine months after the divorce. Zizelman testified that he felt he did not instigate Colvin's agitation, but usually tried to calm Colvin. Zizelman spoke about a particular incident in the fall of 2001 after the couple separated, when Colvin was returning from Little Rock with the child and became agitated at least in part because Zizelman and Vickrey had not answered some questions Colvin had e-mailed them. Zizelman said that in repeated telephone calls, Colvin's agitation escalated to threats that he would take the child away from Austin and that Zizelman would never see the child again. Zizelman testified that he was so concerned by the telephone calls that he drove to Austin from his office in Houston, arranged to pick up the child in a grocery store parking lot, and had security standing by in case of violence. Zizelman testified, however, that Colvin had calmed down and that the exchange occurred peacefully.

Zizelman also testified about more recent events that led to the request for the protective order. On October 18, 2002, he received phone calls from both Vickrey and Colvin after she had given Colvin possession of the child. Vickrey was upset because Colvin had the child in his car and was calling her repeatedly while driving; Colvin called complaining that Vickrey would not answer his calls and would not make time to discuss the issue of the child referring to Vickrey's new husband as "Daddy." Colvin was quite agitated and using abusive language. Zizelman testified that he was concerned, not by Colvin's language, but that his agitation would distract him from his driving with the child in the car. Under cross-examination, Zizelman acknowledged that Colvin was mostly upset that Vickrey would decide not to talk about an issue and hang up; Zizelman said that

Colvin told him he just wanted to set a time to talk about the issue of the child calling someone else "Daddy," not that he necessarily had to talk about it at that time.

On November 1, 2002, Zizelman was in Florida golfing and received a phone call from Colvin who said this was Zizelman's "last chance" to provide information from the school that the child attended and Zizelman owns. Colvin planned to go to the school to confront Vickrey, despite a resolution by the board of directors of the school banning him from entering its premises or contacting its employees. Zizelman testified that Colvin's phone calls and agitated behavior on school premises had previously disrupted the business of the school, including other parents dropping off or picking up their own children. Zizelman testified that Colvin called him five times in two hours, explaining that he intended to go to the school to prove he was being denied access to the child. Zizelman called his daughter and told her to get a Hays County deputy to the school. Meanwhile, Vickrey's husband had the child at a convenience store to make the exchange of custody away from the school. Colvin went to the school, became agitated because he could not find the child, then called Zizelman after confronting the deputy. (Vickrey's husband said he waited forty-five minutes, then went to do errands, one of which took him into a store where cell phone calls could not reach him for about thirty minutes during part of this period.) After the possession exchange was finally arranged, Colvin called Zizelman and said, "I'm going to get [the child] today if I have to use force, and due to what you've done now, you are not ever going to see your F-ing grandson again." Based on the level of Colvin's agitation, Zizelman called his new son-in-law and advised him not to make the exchange because Colvin was too agitated to drive safely and care for a young child. Vickrey's husband complied. Colvin then called Zizelman and threatened legal

4

action, but Zizelman hung up and finished his golf game. A few hours later, Zizelman received a call from Colvin, who was slurring his words and wanting to talk to his son one last time; Colvin had taken an overdose of medication and was in a hospital emergency room. Colvin recovered. Zizelman later testified that Colvin had, only days earlier, taken out a million-dollar life-insurance policy on his own life to benefit the child.

Zizelman testified that, within days, Colvin then threatened to bring actions against him and/or Vickrey for interfering with child custody, for obtaining confidential medical information without his consent, and for contempt. He said Colvin, an attorney, had threatened in about half of their conversations to bring such actions to cost Zizelman large amounts of money because, as an attorney, "he can do it for free."

Under cross-examination, Zizelman conceded that a common theme in Colvin's conversations was that he wanted more communication with Vickrey. Zizelman acknowledged that he had been told that Vickrey's lawyers would not communicate with Colvin, who was proceeding pro se at the trial level. Zizelman admitted that, under his direction, the school had not sent Colvin educational records that were required to be provided under the decree; Zizelman said he had believed that, when the child became a "drop-in" student rather than an enrolled one, the child no longer came within the scope of regulations requiring the school to provide those records. Zizelman said he nevertheless offered to send the records as a friend. Zizelman acknowledged that Colvin's agitation generally concerned issues with Vickrey, and that Colvin had never threatened to hurt the child.

Vickrey testified that Colvin had been physically violent with her from the beginning of the marriage. He punched her in her arm and stomach while they were driving in the Virgin Islands. He once punched her in the back while she was holding the child. He also threw things when angry. In August 2001, when he was angry and throwing things, Vickrey threatened to call the police on the portable phone; Colvin responded by ripping the base of the phone out of the wall and throwing the base at her. He cut his hand on the phone wires. She did not leave the house because their son was sleeping there, but retreated to a guest bedroom; Colvin broke down the door. He then went to the school and broke in. She testified that the occasions on which Colvin got out of control verbally were too numerous to count. She testified that she did not request a protective order earlier because things seemed to be calming down after the divorce when Colvin was out of state for several months. She said that their interactions were smooth for a while after he returned.

Vickrey testified that she tried to avoid discussing the child's calling her new husband "Daddy" and calling Colvin "Tim" because the child was present. She said she hung up on Colvin repeatedly hoping that he would stop calling, because during the calls he was abusive and agitated; she said she was concerned because their three-and-a-half-year-old boy was in Colvin's back seat. She testified that she feared for what the child would understand and feared that Colvin would not be able to drive safely. She said that she believes Colvin has medication to control his anger but often will not take it before driving to exchange possession of the child because the drug makes him drowsy. (Colvin clarified that he had medication for depression, not for anger control.) She testified that she has no doubt that Colvin could be physically violent toward her in the future. She expressed

6

concern about his possession of a gun, though Colvin interrupted and offered to turn in his license to carry a concealed weapon and stipulate that he would not carry it any more.

Vickrey testified that Colvin calls her at work repeatedly using abusive language. She estimated that she has had to leave work 10 to 15 times in order to get him to stop calling there. She said that the school has left the phone off the hook to stop Colvin's calls. She said that the temporary protective order had stopped the calls "somewhat." She conceded on direct examination that he had not physically assaulted her since August 2001; she also testified that she had not been around him much since that day. His history of physical violence, however, makes her fearful when he becomes verbally abusive and agitated.

On cross-examination, Vickrey testified that she resisted supplying business records to Colvin and that, if the court ordered her to produce some of those records because the child was a student at the school, she would withdraw him from the school.

Vickrey testified that, after the hearing on the protective order before the associate judge, Colvin violated the order by phoning her. She testified that Colvin was controlling and became agitated if things were not done his way. She testified that, although she had given into him before, she had stopped. She testified that she was asking for the Court's help in setting reasonable boundaries.

Colvin admitted having anger management problems when dealing with Vickrey. He admitted that his repeated phone calls using abusive language were inappropriate, especially when his son was in the backseat of the car. He said that he took an overdose of sleeping pills because he had been very upset about not getting possession of the child on the weekend of a planned camping

7

trip and had trouble falling asleep; he said that the overdose was an accident, not an attempted suicide. He acknowledged that supervised visitation was advisable, but requested using a friend rather than paying an agency to supervise.

Dr. Carol Butler, the psychologist who was treating Colvin, testified that she did not think he posed a danger to the child. She said that Colvin's impulsive behavior and thoughts did not indicate violent tendencies toward the child. She said that Colvin told her he thinks Vickrey is a good mother, and so would not be tempted to take the child away from her on that basis. Butler testified that past behavior is the best predictor of future behavior. She also testified that Colvin told her he talked about nonviolence with the child, and that the child seemed happy and showed little violence during play for a child his age. She did not think that Colvin needed supervised visits.

At the close of the hearing, the district court granted the protective order. The court found that family violence had occurred and was likely to recur. The court found that the protective orders were in the best interest of Vickrey and the child. The court restricted Colvin from being within 100 yards of Vickrey or communicating directly with her. The court put the same restrictions on Colvin's contact with the child, except during his supervised visits with the child at Kids Exchange. The court also prohibited Colvin from behaving toward Vickrey and the child in ways that were violent, harassing, annoying, alarming, abusive, tormenting, or embarrassing. The court specified the times that Colvin and Vickrey must arrive and depart from Kids Exchange for Colvin's supervised visits so that they were not on site at the same time. The court ordered a psychiatric evaluation of Colvin, and counseling for both Colvin and Vickrey. The court ordered Colvin to relinquish both his handgun license and any handguns to the Hays County Sheriff's Department.

8

## DISCUSSION

Colvin raises three issues on appeal. He contends that the court should not have considered Vickrey's application because it was defective, that the court should not have heard evidence about pre-divorce acts of violence because they should have been raised previously, and that insufficient evidence supports the finding of past and future family violence.

Colvin contends that Vickrey's application failed to comply with two requirements. She did not attach either a copy of the divorce decree or a statement that the decree was unavailable and that a copy of the decree would be filed with the court before the hearing on the application. *See* Tex. Fam. Code Ann. § 82.006 (West 2002). Vickrey admitted that she did not attach either document to her application. Colvin complains that she also listed her county of residence as Travis County despite having moved to Hays County. *See id*. § 82.004. Vickrey admitted that the statement of her residence was a mistake because she moved to Hays County sometime around May 2002. To be entitled to reversal, however, an appellant must show that any error probably caused the rendition of an improper judgment or probably prevented Colvin from presenting his complaint to this Court. *See* Tex. R. App. P. 44.1(a). Colvin has not alleged any harm. The agreed divorce decree was rendered less than a year before the application was filed, so there is no indication that Colvin was unaware of or had no access to the decree; a copy is in the appellate record before this Court. Nor do we find any harm from the failure to allege the proper county of residence. Vickrey's application for protective order lists her residence as being in Dripping Springs, Texas, which is in Hays County. The ex parte temporary protective order issued before the hearing on the protective order restrains Colvin from going to or near her residence in Dripping Springs. Further, Colvin

9

indicated at the hearing that he knew Vickrey had moved in the summer of 2002. We find no harm from the court hearing the application despite these procedural deficiencies.

Colvin contends that the court erred by hearing evidence of pre-divorce incidents that should have been raised during the divorce proceeding. A claim of res judicata requires proof that the same parties (or their privies) were involved in a previous action in which a final judgment on the merits was rendered, and that a second action is based on the same claims as were raised or could have been raised in the previous action. *Amstadt v. United States Brass Corp.*, 919 S.W.2d 644, 652 (Tex. 1996). A final judgment in a custody suit is res judicata regarding the child's best interest under the conditions then existing.[2] *Knowles v. Grimes*, 437 S.W.2d 816, 817 (Tex. 1969).

We examine the district court's decision to admit evidence for an abuse of discretion. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995); *In re Commitment of Browning*, 113 S.W.3d 851, 865 (Tex. App.—Austin 2003, pet. denied). A trial court abuses its discretion when it acts without regard for any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). In cases specifically addressing the admissibility of evidence of pre-divorce conduct in motions to modify divorce decrees, courts have held that

---

[2] This principle of res judicata is woven into the family code's requirement that a person challenging a custody decree must show that circumstances have changed materially and substantially since the time of the order. *See* Tex. Fam. Code Ann. § 156.101 (West 2004).

10

evidence of prior conduct of one of the parties can be introduced to corroborate evidence of similar conduct since the decree. *In re C. E. B.*, 604 S.W.2d 436, 443 (Tex. Civ. App.—Amarillo 1980, no writ); *see also Wilson v. Elliott*, 73 S.W. 946, 947 (Tex. 1903).

At issue here is whether Colvin's behavior posed a danger to Vickrey and the child. Colvin's res judicata claim falters because Vickrey's complaint is not limited to pre-divorce instances, but was prompted at least in part by his actions after the divorce on October 18 and November 1, 2002, which included the recurrence of the spiraling anger and the new action of the drug overdose. Further, Butler, Colvin's treating psychologist, opined that the best predictor of future behavior was past behavior. Thus, according to his own witness, Colvin's occasionally violent and often verbally abusive pre-divorce behavior could shed light on his potential behavior. Despite the lull in such activities during much of 2002, the recurrence of Colvin's spiraling anger allowed for an exploration of previous behavior to provide context and guidance for the assessment of future behavior. We cannot say that the court abused its discretion by permitting evidence of Colvin's pre-divorce behavior.

Colvin also challenges the sufficiency of the evidence to support the findings that family violence had occurred and is likely to occur in the future. Both findings are required before a court may issue a protective order under the family code. Tex. Fam. Code Ann. § 85.001(a) (West 2002). The legislature has defined family violence in relevant part as

> an act by a member of a family or household against another member of the family or household that is intended to result in physical harm, bodily injury, assault, or sexual assault or that is a threat that reasonably places the member in fear of imminent physical harm, bodily injury, assault, or sexual assault, but does not include defensive measures to protect oneself . . . .

11

*Id*. § 71.004(1). Colvin contends that, even if we consider the pre-divorce incidents, there is no evidence of the intent requisite to show family violence. He contends that this absence of intent prevents a showing of the likelihood of future violence, as does the absence of a pattern of violence.

Colvin challenges both the legal and factual sufficiency of the evidence. We review the sufficiency of the evidence to support a trial court's findings of fact by the same standards we use in reviewing the sufficiency of the evidence supporting a jury's findings. *See Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Starcrest Trust v. Berry*, 926 S.W.2d 343, 352 (Tex. App.—Austin 1996, no writ). In reviewing a legal-sufficiency challenge, we consider the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997); *Associated Indem. Corp. v. CAT Contracting*, 964 S.W.2d 276, 285-86 (Tex. 1998). We will uphold the finding if more than a scintilla of evidence supports it. *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995); *Catalina*, 881 S.W.2d at 297. The evidence supporting a finding amounts to more than a scintilla if reasonable minds could arrive at the finding given the facts proved in the particular case. *Burroughs Wellcome Co.*, 907 S.W.2d at 499. In conducting a factual-sufficiency review, we consider and weigh all of the evidence and set aside the judgment only if it is factually so weak or so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *In re King's Estate*, 244 S.W.2d 660, 661 (Tex. 1951).

Colvin's argument that there is no evidence that he intended to hurt anyone ignores the evidence, the reasonable inferences, and the alternative legal standard for family violence. Colvin points to the lack of testimony that he intended to harm anyone and to Vickrey's statement

12

that she was not sure whether Colvin's aim was to hurt her. Yet there was uncontroverted testimony that he punched Vickrey while driving at the beginning of their marriage, and later punched her in the back while she was holding the child. There is no evidence to counter the clear, reasonable inference that Colvin intended to hurt Vickrey when he punched her—particularly when her back was turned and she was holding their child. Further, Colvin ignores the alternative legal standard for family violence that involves, not an intentional assault, but "an act by a member of a family or household against another member of the family or household . . . that is a threat that reasonably places the member in fear of imminent physical harm, bodily injury, assault, or sexual assault." Tex. Fam. Code Ann. § 71.004(1). Whether Colvin intended to injure Vickrey when tossing furniture and appliances and breaking down a door, Vickrey testified that Colvin frightened and intimidated her when he started throwing things like a chair and the base of a phone she intended to use to call police. There was testimony that, more than once—including on November 1, 2002—Colvin threatened to use force to effect a change in possession of the child. The evidence is legally and factually sufficient to support the finding of past family violence.

This history, coupled with the late 2002, post-divorce recurrence of the spiraling anger and the new element of the drug overdose, provides sufficient evidence to support the court's conclusion that family violence was likely to occur in the future. Although Colvin had not used physical force against or around family members since August 2001, he threatened to use force to get possession of the child in late 2002. His behavior was consistent with previous instances in which he had engaged in actions that either hurt Vickrey or placed her in fear of imminent injury. Although the two no longer lived together, Colvin's anger, threats of force, and occasion to interact

13

with family members in order at least to change possession of the child support the court's conclusion that family violence was likely.

We note that the court appears to have tailored the protective order to the particular threats posed. The court attempted to remove triggers for Colvin's anger by formalizing the possession exchange and forbidding direct contact between Vickrey and Colvin. The court sought to address factors predisposing them to conflict by ordering psychological counseling for both parents. The court sought to eliminate a tool for expressing anger, and a source of Vickrey's fear, by having Colvin surrender his gun license and gun. In all these things, the court's order is proportionate to the nature and causes of past family violence and the likelihood of future family violence.

## CONCLUSION

We conclude that the district court did not err by considering and granting the application for protective order because the deficiencies alleged in the application were not shown to have harmed Colvin in the trial court or in this Court. Likewise, the court did not err by admitting evidence of pre-divorce incidents, or by finding the evidence sufficient to support a protective order. We affirm the order.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices B. A. Smith and Patterson

Affirmed

Filed:   April 22, 2004

14