

# IN THE
# TENTH COURT OF APPEALS

## No. 10-11-00071-CV

**DORIS DICKERSON INDIVIDUALLY
& AS REPRESENTATIVE OF THE ESTATE
OF JERRY DICKERSON & LONGHORN PEST CONTROL,**

$\qquad$ **Appellants**

 **v.**

**STATE FARM LLOYD'S INC. D/B/A
STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY AND/OR D/B/A
STATE FARM AND LAURA CAMPOS,**

$\qquad$ **Appellees**

From the 220th District Court
Hamilton County, Texas
Trial Court No. CV02308

## MEMORANDUM OPINION

Appellants, Doris Dickerson, individually and as representative of the estate of

Jerry Dickerson, and Longhorn Pest Control, challenge the trial court's granting of

summary judgment and several other orders in favor of appellee, Laura Campos.[1] By four issues, appellants argue that the trial court erred in: (1) granting Laura's no-evidence motion for summary judgment; (2) sustaining Laura's objections to appellants' summary judgment evidence of proximate cause; (3) granting Laura's motion to sever; and (4) denying appellants' motions to limit the testimony of Laura and her husband, Miguel Campos. We affirm.

## I. BACKGROUND

This lawsuit arises out of a motor vehicle accident that occurred near Hico, Texas, on February 19, 2006. The accident involved a Toyota Tacoma pickup truck driven by the decedent, Jerry Dickerson, and two other vehicles, a Kia Sorrento driven by Jennifer Green and a Lexus ES300 sedan driven by Laura.[2] The facts regarding how the accident took place are disputed.

It is undisputed that, on February 19, 2006, Jerry, a sixty-nine year old, was traveling southbound on Highway 281 and lost control of his pickup truck on an icy surface on the Bosque River bridge.[3] Based on his investigation, Texas Department of Public Safety Trooper Erich Neumann concluded that Jerry lost control of his pickup truck because he was driving at an unsafe speed with regard to the road conditions, a fact that even appellants' accident reconstructionist Cam Cope admitted. After losing

---

[1] State Farm Lloyd's Inc. d/b/a State Farm Mutual Automobile Life Insurance Company and/or d/b/a State Farm is not a party to this appeal.

[2] Appellants chose not to file suit against Green; thus, she is not a party to this appeal.

[3] Appellants state that, at the time of the accident, Jerry was "doing business as Longhorn Pest Control . . . ." With regard to the iciness of the bridge, the Justice of the Peace who arrived at the scene after the accident had transpired noted that the roadway was so icy that she could barely walk.

control of his pickup truck, it was alleged that Jerry struck the high curb of the bridge and then Green's Kia that was traveling in the oncoming lane. Laura asserts on appeal that although "no passenger in the Kia needed medical attention" and the "damage rating to the Kia was lower than the other vehicles," the record contains evidence that the Kia sustained major damage, a claim that appellants dispute. Nevertheless, after striking the Kia, Jerry's pickup truck began to spin. The pickup truck allegedly collided with the high curb of the bridge at least one more time, possibly several times, and the rear axle of the pickup truck became dislodged. After striking the high curb of the bridge once more, the pickup truck began sliding sideways southbound down the bridge "with considerable force."

Laura was driving her Lexus sedan northbound on Highway 281 at the time this incident transpired.[4] Laura alleges on appeal that she was driving right behind Green's Kia when the incident began. Upon seeing the collision between Jerry's pickup truck and the Kia, Laura states that she slowed down and moved toward the center of the

_____

[4] Deputy Neumann responded to the accident and mentioned in his report that he spoke with Laura's husband, Miguel, about the incident. According to Deputy Neumann, Miguel described the incident as follows:

I [Deputy Neumann] contacted the passenger of VEH #3, CAMPOS, M, via telephone while he was at the hospital. He stated that they were NORTHBOUND approximately 200 FEET behind VEH #2 (Green's Kia) when they observed VEH #1 (Jerry's pickup truck) enter the bridge SOUTHBOUND at a high rate of speed "definitely too fast for conditions." VEH #1 began "fishtailing" and at one point[,] struck the curb, causing the vehicle to skid towards VEH #2. VEH #1 struck VEH #2 sliding broadside to it, VEH #2's front left corner contacting VEH #1 midway down the RIGHT side between the cab and bed of the truck. VEH #2 then spun NORTHBOUND[,] and VEH #1 spun SOUTHBOUND towards VEH #3. VEH #3 attempted to slow and evade but was unable to due to lack of traction on the bridge. VEH #3 slid partially into the SOUTHBOUND lanes attempting to avoid impact, but VEH #1, after completing at least one revolution following impact with VEH #2, struck their vehicle sliding sideways with considerable force. VEH #3 contacted VEH #1 in the same place as VEH #2 had in the first impact.

Dickerson v. State Farm Lloyd's Inc.

bridge in an attempt to avoid colliding with either of the vehicles. However, Laura was unable to avoid colliding with Jerry's pickup truck, which was now careening down the bridge sideways. The side of Jerry's pickup truck collided with the front of Laura's sedan. Neither Laura nor her husband, a front-seat passenger at the time, sustained serious injuries.

Jerry, however, died at the scene of the accident. The actual cause of Jerry's death was hotly contested in the trial court. On February 14, 2008, appellants filed their original petition asserting wrongful death and survival claims against Laura and seeking monetary compensation for the death of Jerry. Appellants alleged that Laura was negligent in failing to: (1) "yield right of way to [Jerry]"; (2) "come to a stop before impacting the decedent's vehicle"; (3) "keep in a single northbound lane"; and (4) "take proper advance evasive action prior to impact." Subsequently, appellants amended their original petition to assert claims against Jerry's uninsured/underinsured motorist carrier, State Farm Lloyd's, Inc. d/b/a State Farm Mutual Automobile Insurance Company ("State Farm").[5]

In support of their allegations against Laura and State Farm, appellants proffered three expert witnesses—Cope, Al Davies, M.D., and Emergency Medical Technician ("EMT") Steven Edgar. Cope testified via deposition that Laura failed to stop or reduce her speed upon seeing Jerry collide with the Kia. He also opined that, based on his calculations, Laura was speeding given the road conditions and that she failed to take evasive action to reduce or eliminate the risk of colliding with Jerry's pickup truck.

---

[5] The record reflects that Laura was also insured by State Farm.

Cope estimated that, at the point of impact, Jerry's pickup truck was "at rest or nearly at rest" and that Laura was traveling between forty-five and fifty-five miles per hour.

Dr. Davies recounted that Jerry's death certificate indicated that he died as a result of blunt-force trauma sustained during the accident. Dr. Davies opined that Jerry's collision with Laura was far more injurious than the collision between Jerry's pickup truck and the Kia. Dr. Davies also testified that Jerry likely had a skull fracture, a neck or spinal injury, and lung, esophageal, or aortic injuries as a result of the accident. Dr. Davies admitted that any one of these injuries could have caused Jerry's death; however, it was Dr. Davies's opinion that Jerry died of exsanguinations or "bleeding out" from one of his thoracic injuries. Dr. Davies was unable to rule out the possibility that Jerry's internal bleeding could have been caused by the initial collision with the Kia.

Edgar, the EMT that treated Jerry at the scene of the accident, stated that it was his belief, within a reasonable medical probability, that Jerry's collision with Laura's sedan was more severe than any other impact involved in the accident and that Jerry's collision with Laura's sedan was the impact that caused his death.

Subsequently, Laura filed a no-evidence motion for summary judgment, contending that there was no evidence that her alleged acts proximately caused Jerry's death or any of the damages associated with the accident. Without a hearing, Judge James Morgan, granted Laura's no-evidence motion for summary judgment. In his letter ruling, Judge Morgan stated that the deposition testimony of appellants' expert

witnesses failed to establish causation and, thus, prevented appellants' expert witnesses from testifying as to causation.

Appellants filed a motion for reconsideration, which Judge Morgan eventually granted. Thereafter, several motions were filed by both parties. Laura filed a motion to strike the testimony of Cope. State Farm moved to strike the testimony of Dr. Davies and Edgar, arguing that their causation testimony did not meet the standards set forth in *Daubert* and its progeny, *see generally Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993); Laura adopted this motion. Laura filed a motion to sever appellants' claims against her from those against State Farm, and she filed another no-evidence motion for summary judgment. And finally, appellants moved to limit the trial testimony of Laura and her husband for "belatedly turning in their deposition errata sheets." All of these motions were presented to Judge Morgan's successor, Judge Phil Robertson.

After reviewing the documents contained in the file, Judge Robertson: (1) granted the motions to strike the opinions of Edgar, Dr. Davies, and Cope; (2) granted Laura's motion to sever; (3) denied appellants' motion to limit the testimony of Laura and her husband; and (4) granted Laura's re-urged no-evidence motion for summary judgment. This appeal followed.

## II. APPELLEE'S OBJECTIONS TO APPELLANTS' SUMMARY JUDGMENT EVIDENCE

By their second issue, appellants argue that the trial court abused its discretion in striking the testimony of their experts, Dr. Davies, Edgar, and Cope. We disagree.

### A. Standard of Review and Applicable Law

The trial court serves as an evidentiary gatekeeper by screening out irrelevant and unreliable expert evidence, and it has broad discretion to determine the admissibility of such evidence. *See Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 590 (Tex. 1999); *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 718-19 (Tex. 1998); *see also E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995). The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles such that the ruling was arbitrary or unreasonable. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). A reviewing court cannot conclude that a trial court abused its discretion simply because the reviewing court would have ruled differently. *See Loftin v. Martin*, 776 S.W.2d 145, 146 (Tex. 1989).

The Texas Rules of Evidence provide that: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of opinion or otherwise." TEX. R. EVID. 702. To establish a witness's expert qualifications, the party calling the witness must show "that the expert has 'knowledge, skill, experience, training, or education' regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject." *Roberts v. Williamson*, 111 S.W.3d 113, 121 (Tex. 2003) (quoting *Broders v. Heise*, 924 S.W.2d 148, 153 (Tex. 1996)); *see Gammill*, 972 S.W.2d at 718. Whether a witness is qualified to offer expert testimony is a

matter committed to the trial court's discretion. *Broders*, 924 S.W.2d at 151; *see also Gammill*, 972 S.W.2d at 718-19.

Essentially, a two-part test governs whether expert testimony is admissible: (1) the expert must be qualified; and (2) the testimony must be relevant and based on a reliable foundation. *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex. 2001); *see Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800 (Tex. 2006). "Admission of expert testimony that does not meet the reliability requirement is an abuse of discretion." *Mendez*, 204 S.W.3d at 800. Expert testimony is unreliable if it is based on unreliable data, or if the expert draws conclusions from his underlying data "based on flawed methodology." *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997). Expert testimony is also unreliable if "'there is simply too great an analytical gap between the data and the opinion proffered.'" *Gammill*, 972 S.W.2d at 726 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 519, 139 L. Ed. 2d 508 (1997)).

In *E.I. du Pont de Nemours & Co. v. Robinson*, the Texas Supreme Court set out six factors that courts may consider in deciding whether expert testimony is reliable:

(1) the extent to which the theory has been or can be tested;

(2) the extent to which the technique relies on the subjective interpretation of the expert;

(3) whether the theory has been subjected to peer review and/or publication;

(4) the technique's potential rate of error;

(5) whether the underlying theory or technique generally has been accepted as valid by the relevant scientific community; and

(6) the nonjudicial uses which have been made of the theory or technique.

923 S.W.2d at 557. These *Robinson* factors are non-exclusive, *see Mendez*, 204 S.W.3d at 801, and "are not always useful in evaluating expert testimony." *Id.* at 802. When the *Robinson* factors do not readily lend themselves to a review of the expert testimony, "there must be some basis for the opinion offered to show its reliability." *Gammill*, 972 S.W.2d at 726; *see Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 39 (Tex. 2007) (recognizing that the *Robinson* factors do not always readily lend themselves to a review of expert testimony in automobile-accident cases); *Mendez*, 204 S.W.3d at 802. An expert's "bare opinion" will not suffice and is unreliable if "based solely upon his subjective interpretation of the facts." *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 906 (Tex. 2004). In automobile-accident cases, the supreme court has found it appropriate to analyze whether the expert's opinion actually fits the facts of the case, ostensibly adopting the "analytical gap" test for automobile-accident cases. *TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 235, 239 (Tex. 2010); *see City of San Antonio v. Pollock*, 284 S.W.3d 809, 818 (Tex. 2009) ("'[A] claim will not stand or fall on the mere *ipse dixit* of a credentialed witness.'") (quoting *Burrow v. Arce*, 997 S.W.2d 229, 235 (Tex. 1999) (emphasis in original)).

In addition, the general rule has long been that expert testimony is necessary to establish causation as to medical conditions outside the common knowledge and experience of jurors. *See Guevara v. Ferrer*, 247 S.W.3d 662, 668 (Tex. 2007) (explaining that "non-expert evidence alone is sufficient to support a finding of causation in limited circumstances where both the occurrence and conditions complained of are such that

the general experience and common sense of laypersons are sufficient to evaluate the conditions and whether they were probably caused by the occurrence"); *Roark v. Allen*, 633 S.W.2d 804, 809 (Tex. 1982) (holding that "the diagnosis of skull fractures is not within the experience of the ordinary layman" and therefore required expert testimony); *Ins Co. of N. Am. v. Myers*, 411 S.W.2d 710, 713 (Tex. 1966) (holding that an "inference that a pre-existing tumor was activated and the deadly effects of a malignancy accelerated by an injury" was a "question of science determinable only from the testimony of expert medical professionals"); *see also Kaster v. Woodson*, 123 S.W.2d 981, 983 (Tex. Civ. App.—Austin 1938, writ ref'd) ("What is an infection and from whence did it come are matters determinable only by medical experts."). However, in some circumstances, Texas courts have recognized an exception to this general rule—that causation findings linking events and physical conditions could be sufficiently supported by non-expert evidence. *See Parker v. Employers Mut. Liab. Ins. Co. of Wis.*, 440 S.W.2d 43, 46 (Tex. 1969).

**B. Dr. Davies**

In his letter ruling on State Farm and Laura's motion to strike Dr. Davies's testimony, Judge Robertson stated the following:

> The Motion is granted. The data available for Dr. Davies to form an opinion is very limited. He is unable to rule out or rule in alternative causes of Mr. Dickerson's injuries and death. The scientific articles on which he relies for confirmation of his opinions were not themselves peer reviewed. The Plaintiffs have failed to establish that Dr. Davies'[s] opinions would rise above mere speculation so as to offer genuine assistance to the jury.

In his deposition, Dr. Davies testified that, in 2004, he formed an independent practice of critical care medicine, which involves "[t]aking care of people who are at risk of death through some imminent means such as a heart attack, breathing failure, kidney failure, bleeding, [or] trauma." With regard to his credentials, Dr. Davies stated that he received his medical degree from the University of Utah medical school; that he has been licensed to practice medicine in Texas since 1984; and that he is board certified in internal medicine and endocrinology. However, he denied having any experience in accident reconstruction or having any engineering or biomechanical licenses or degrees. Dr. Davies testified that he took some physics courses in college while obtaining a degree in chemistry and thermodynamics. He acknowledged that it is "more appropriate to have an accident reconstructionist make those calculations" of the specific forces exerted upon vehicle occupants in automobile accidents. Nevertheless, Dr. Davies opined that Jerry died of exsanguinations and that the collision with Laura's sedan was the cause of Jerry's death. Dr. Davies made these conclusions without ever physically examining Jerry, conducting an autopsy, or reviewing any of Jerry's medical records that may have been available. Instead, Dr. Davies relied exclusively upon the EMS report drafted by Edgar, which noted that Jerry had heavy bleeding from his nose and mouth, and the death certificate, which generally stated that Jerry died from blunt force trauma sustained during the accident, drafted and signed by the local Justice of the Peace.

Later in his deposition testimony, Dr. Davies admitted that he could not rule out that Jerry sustained internal bleeding as a result of impacts with the Kia or with the

bridge. In addition, Dr. Davies acknowledged that Jerry also sustained a head injury, which was described as a skull fracture. Dr. Davies stated that he could not rule out the possibility that Jerry's head injury caused his death and that the head injury could have been caused by the impact with the Kia. Dr. Davies later made the following conclusory statements about Jerry's additional injuries:

> Well, he was bleeding from both his esophagus and his trachea in large amounts. So, and again it occurred in a context of a T-bone kind of collision. So, a major disruption of organs, like a transection of the esophagus, a rupture of the aorta, a rupture of the trachea or some combination of something of that nature is a probably [sic] explanation. He probably had—he had to have more than one because if, for example, he simply transected his trachea, he wouldn't be having so much blood coming out of the esophagus.

Dr. Davies also testified that Jerry sustained a neck and spine injury and admitted that he could not rule out any of the above-mentioned injuries as the cause of Jerry's death. Moreover, Dr. Davies stated that he could not determine with reasonable medical certainty at what time during the accident the potentially fatal neck and back injury would have occurred. Dr. Davies was also unable to rule out the possibility that "other disease process[es]" could have contributed to Jerry's death.

It is well-established that an expert witness's failure to rule out alternative causes of an incident may render his opinion unreliable. *See Transcon. Ins. Co. v. Crump*, 330 S.W.3d 211, 217-218 (Tex. 2010) ("'An expert's failure to rule out alternative causes of an incident may render his opinion unreliable.'") (quoting *Hughes*, 306 S.W.3d at 237); *Robinson*, 923 S.W.2d at 559 ("An expert who is trying to find a cause of something should carefully consider alternative causes. . . . Dr. Whitcomb's failure to rule out

other causes of the damage renders his opinion little more than speculation.") (citation omitted). However, the *Crump* court further noted that a medical causation expert need not "'disprov[e] or discredit[] every possible cause other than the one espoused by him.'" 330 S.W.3d at 218 (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987)). If that were the case, then few expert opinions would be considered reliable. *Id.* Nevertheless, "if evidence presents 'other plausible causes of the injury or condition that *could* be negated, the [proponent of the testimony] *must* offer evidence excluding those causes with reasonable certainty.'" *Id.* (quoting *Havner*, 953 S.W.2d at 720) (emphasis in original); *see Robinson*, 923 S.W.2d at 558-59 (concluding that the trial court did not abuse its discretion by excluding testimony by an expert who "conducted no testing to exclude other possible causes . . . even though he admitted in his deposition that many of the symptoms could be caused by" other specific conditions).

Here, no autopsy of Jerry's body was conducted, nor did anyone review Jerry's medical records. Dr. Davies testified that an autopsy of Jerry's body could have been helpful in determining the extent of his injuries. In addition, Dr. Davies was unable to rule out several potential causes of Jerry's death or when those potential causes occurred, though Dr. Davies admitted that his review of the EMS report revealed that Jerry sustained numerous potentially fatal injuries as a result of the incident. In spite of this, Dr. Davies still opined that Jerry died of exsanguinations as a result of his collision with Laura. These statements amount to no more than speculation as to the cause of Jerry's death. Because Dr. Davies was unable to rule out other plausible causes of Jerry's death that were raised by the evidence and because an autopsy was not

conducted and Dr. Davies did not review Jerry's medical records when either could have been useful to rule out other plausible causes of Jerry's death, we cannot say that the trial court erred when it determined that Dr. Davies's testimony is not reliable or would not be helpful to the jury. *See Crump*, 330 S.W.3d at 218; *Hughes*, 306 S.W.3d at 237; *Ramirez*, 159 S.W.3d at 906; *see also Havner*, 953 S.W.2d at 720; *Robinson*, 923 S.W.2d at 558-59.

Furthermore, Dr. Davies testified that the impact between Jerry's pickup truck and Laura's sedan was a "T-bone" and that the injuries that caused Jerry's death could have only been caused by such an impact. Dr. Davies made these statements without any experience in accident reconstruction. In fact, Dr. Davies admits that he is unqualified to testify as to how the accident occurred; he also states that he has no personal knowledge as to how the accident occurred and that he did not try to determine the speed of the vehicles or how hard each of the impacts were. Rather, Dr. Davies relied on articles, many of which were not peer reviewed, that state that more serious injuries occur from "T-bone" impacts than from "side-side" impacts. These articles were not included in the summary judgment record, and based on Dr. Davies's comments, these articles do not appear to be a reliable foundation upon which he could rely in producing his opinion. Based on his own statements, we conclude that accident reconstruction is not within Dr. Davies's "'knowledge, skill, experience, training, or education.'" *Roberts*, 111 S.W.3d at 121 (quoting *Broders*, 924 S.W.2d at 153). Furthermore, we cannot say that the reconstruction of the accident, the determination of the impacts on the vehicles and the vehicles' occupants, and the determination of which

impact caused Jerry's death is within the "general experience and common sense of laypersons . . . to evaluate the conditions and whether they were probably caused by the occurrence." *Guevara*, 247 S.W.3d at 668; *see Roark*, 633 S.W.2d at 809; *Myers*, 411 S.W.2d at 713; *see also Woodson*, 123 S.W.2d at 983. As such, we conclude that the trial court did not err in concluding that Dr. Davies was not qualified to opine on how the accident occurred and which impact caused Jerry's death. *See Guevara*, 247 S.W.3d at 668; *Roberts*, 111 S.W.3d at 121; *Broders*, 924 S.W.2d at 153; *Roark*, 633 S.W.2d at 809; *Myers*, 411 S.W.2d at 713; *see also Woodson*, 123 S.W.2d at 983. Therefore, based on the foregoing, we cannot say that the trial court abused its discretion in striking Dr. Davies's testimony. *See Sanchez*, 997 S.W.2d at 590; *Gammill*, 972 S.W.2d at 718-19; *see also Robinson*, 923 S.W.2d at 558.

## C. Edgar

With respect to Edgar's testimony, Judge Robertson noted that:

> The Motion is granted. Steven Edgar is not qualified to render an expert opinion regarding Mr. Dickerson's cause of injuries or death. There is no factual or scientific basis for his conclusions regarding the severity of the impacts, nor the specific causes of Mr. Dickerson's injuries or death. Mr. Edgar may testify as to what he saw [at] the scene of the collisions and what he did as a first responder, but any expert opinions concerning cause of injuries or death, and the severity of the collisions is excluded.

Edgar testified that, in his experience as an EMT and with the local fire department, he investigated many automobile accidents, including several that involved serious injuries or death. Edgar stated that he had investigated such accidents for "seven or eight years now." Edgar then described the scene of the accident when he arrived. At the time of Edgar's arrival, Jerry was trapped inside his pickup truck and

was not breathing, though he did have a slight pulse. Edgar noticed that large quantities of blood were spewing from Jerry's mouth and nose. Edgar and other EMTs tried to treat and resuscitate Jerry; however, their efforts failed. Ultimately, Jerry was pronounced dead at the scene of the accident, and, at his family's request, Jerry's body was immediately transferred to the local funeral home. No autopsy of Jerry's body was conducted.

Regarding the particulars of the accident, Edgar stated that the collision between Jerry's pickup truck and the Kia was a "medium impact" that looked to him like "a glancing type shot." Edgar opined that Laura's sedan "pretty much T-boned [Jerry's pickup truck] in the center," which apparently "just about folded the truck in half." When asked what his opinion was regarding the cause of Jerry's death, Edgar testified that:

> Based on the things that we've learned as far as impact and what it does to the body inside, you have your different collisions. Of course, you've got the collision with whatever they hit. Then the body itself collides with the seat belts, steering wheel, air bags. You've got that collision. Once it stops, you've also still got the motion of internal organs and stuff that still impact the inner walls and chest cavity and abdomen and whatnot. With all that, there's several different things that could have been ruptured internally. I cannot tell you exactly which one; but liver, stomach, aortic shears, all your tendons and that that [sic] hold the organs somewhat in place, when they get jarred like that, tear loose tissue inside the body and can cause substantial internal bleeding. So, with the amount of blood that came from his mouth and nose, he definitely had lots of internal bleeding.

Edgar also noted that he thought the collision between Jerry's pickup truck and Laura's sedan was the only possible collision that could have caused the injuries that Jerry sustained. In asserting this opinion, Edgar relied on his experience and training

working at accident sites and an undisclosed book apparently used in paramedic school.

Edgar later admitted that he is not a doctor and that doctors typically diagnose and determine which injuries the patient has sustained. Like Dr. Davies, Edgar was unable to pinpoint the exact injuries that Jerry sustained. In addition, Edgar could not determine which of Jerry's internal organs had caused the excessive bleeding that Edgar observed. Edgar acknowledged that an autopsy likely would have yielded a more accurate portrayal of Jerry's injuries. He also acknowledged that it was not his responsibility, but rather that of the Justice of the Peace or the doctor conducting the autopsy, to determine the cause of Jerry's death. Edgar testified that Jerry also had a puncture wound to his head and a spinal injury, both of which could have caused his death. In determining that Laura's sedan had caused the injuries that ultimately killed Jerry, Edgar did not take any measurements at the scene of the accident, nor did he take any photographs or do a detailed inspection of the vehicles. He briefly examined the damage to both vehicles and concluded that the collision with Laura's sedan had killed Jerry. Edgar denied having any training in accident reconstruction or biomechanical engineering. He also denied ever having reviewed Deputy Neumann's police report chronicling the accident, though he disagreed with most of the results of Deputy Neumann's investigation.

Appellants did not provide any summary judgment evidence demonstrating that Edgar was qualified as an accident reconstructionist so as to describe what actually occurred during an accident which he did not personally observe. Moreover, there is

no evidence demonstrating that Edgar, a non-physician expert, was qualified to opine about the injuries Jerry sustained and that such injuries were only caused by the impact between Jerry's pickup truck and Laura's sedan. Furthermore, and perhaps more importantly, Edgar does not provide any scientific studies or information to support his bare assertions that the impact with Laura's sedan is what killed Jerry. Essentially, there is no link between medical science and the facts in this case. *See Ramirez*, 159 S.W.3d at 906 (holding that an expert's "bare opinion" will not suffice and is unreliable if "based solely upon his subjective interpretation of the facts"); *see also Hughes*, 306 S.W.3d at 239 ("Expert testimony is also unreliable if it is not grounded in scientific methods and procedures, but rather is based upon subjective belief or unsupported speculation."). On appeal, appellants attempt to argue that Edgar was qualified to give his opinion about what impact and injuries killed Jerry based on his experience alone. However, Edgar testified that, during the course of his career, he had only worked on four or five accidents that resulted in fatalities and that he had not worked on a case involving multiple impacts and the death or serious injury of one or more vehicle occupants.

Given our review of the record, we do not believe that Edgar is qualified to opine on medical causation or accident reconstruction. *See, e.g., Schronk v. City of Burleson*, No. 10-07-00399-CV, 2009 Tex. App. LEXIS 5654, at *30 (Tex. App.—Waco July 22, 2009, pet. denied) (mem. op.) ("Because Dr. Reese is not a medical doctor and because his affidavit and CV do not demonstrate any special experience in determining medical causation, we cannot say the court abused its discretion by determining that he is not

qualified to render an expert opinion on cause of death.") (citing *Methodist Health Ctr. v. Thomas*, No. 14-07-00085-CV, 2007 Tex. App. LEXIS 6655, at **8-9 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (mem. op.); *Marts ex rel. Marts v. Transp. Inc. Co.*, 111 S.W.3d 699, 703-04 (Tex. App.—Fort Worth 2003, pet. denied)); *see also LMC Complete Auto., Inc. v. Burke*, 229 S.W.3d 469, 478 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) ("To constitute evidence of causation, a *medical expert's* opinion must rest in reasonable medical probability.") (emphasis added) (citing *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 500 (Tex. 1995); *Myers*, 411 S.W.2d at 713).[6]  While we recognize that Edgar can testify as a lay witness as to what he observed at the scene of the accident, he cannot testify as an expert as to causation in this case.  We also recognize that, in some instances, a witness can be considered an expert as to medical causation based on special experience.  *See Esquivel v. El Paso Healthcare Sys.*, 225 S.W.3d 83, 90 (Tex. App.—El Paso 2005, no pet.); *see also Shaw v. Triple J Mowers, Inc.*, No. 10-04-00262-CV, 2006 Tex. App. LEXIS 1316, at **5-6 (Tex. App.—Waco Feb. 15, 2006, no pet.).  However, this exception does not apply in this case given Edgar's limited experience—four or five

---

[6] To the extent that appellants argue that Edgar's testimony about causation should be allowed as a layperson's observations, we note that the supreme court has specifically stated that "non-expert evidence alone is sufficient to support a finding of causation in limited circumstances where both the occurrence and conditions complained of are such that the general experience and common sense of laypersons are sufficient to evaluate the conditions and whether they were probably caused by the occurrence." *Guevara v. Ferrer*, 247 S.W.3d 662, 668-69 (Tex. 2007).  Specifically, the *Guevara* court noted that determining causation of "certain types of pain, bone fractures, and similar basic conditions" following an automobile accident was within the competence of lay jurors.  *Id.* at 668.  This case is not a limited circumstance where Jerry's injuries are clearly attributable to one simple act by one actor thus obviating the need for expert testimony.  Here, Jerry sustained multiple major injuries as a result of multiple collisions with vehicles and inanimate objects.  In fact, none of appellants' experts could agree on the specific impact and the specific injury that killed Jerry.  Given this, we cannot say that this incident is within the general experience and common sense of laypersons to evaluate the conditions and determine causation without the aid of expert testimony.  *See id.* at 668-69.

instances—with automobile accidents involving fatalities and the dearth of evidence explaining precisely Edgar's involvement in such accidents and whether such accidents also involved multiple impacts and multiple actors so as to provide this Court or the trial court with a basis for concluding that Edgar's experience meets this exception. *See Esquivel*, 225 S.W.3d at 90; *see also Shaw*, 2006 Tex. App. LEXIS 1316, at **5-6.

And, finally, even if he was qualified to opine on such matters, the "bare opinion" Edgar gives in his deposition is premised "solely upon his subjective interpretation of the facts," which renders his opinion unreliable. *See Ramirez*, 159 S.W.3d at 906 (stating that an expert's reliance on the "laws of physics" does not provide a sufficient basis for his opinion). Therefore, based on the foregoing, we conclude that the trial court did not abuse its discretion in striking the expert testimony of Edgar. *See Sanchez*, 997 S.W.2d at 590; *Gammill*, 972 S.W.2d at 718-19; *see also Robinson*, 923 S.W.2d at 558.

**D. Cope**

With respect to Cope's testimony, Judge Robertson stated:

The Motion is granted. I find that Cam Cope's opinions are both conclusory and subjective. His opinions are not based on sufficient physical evidence to be more than speculation. Mr. Cope's credentials do not bridge the analytical gap between the scant available evidence and the conclusions he has reached as to Defendant's failure to stop or stop earlier, failure to take proper evasive action, and the speed of any vehicle. His use of a computer program to generate results, does not cure the lack of foundational information to generate reliable results. Cope is not qualified to give an expert opinion assigning cause of death to a particular collision. Even if he were qualified, there was insufficient data for him to do so. His opinions would be more confusing than helpful to the jury.

In conducting his investigation of the accident, Cope testified that he reviewed Deputy Neumann's accident report, photographs of the vehicles after the accident occurred, and information sent by an unknown Bill Rosenbluth. Cope also noted that he went to the scene of the accident for observational purposes. He did not, however, take any measurements at the scene of the accident. Cope explained that the bridge had been replaced shortly after the accident transpired, though Cope stated that the replacement of the bridge did not have anything to do with this accident and that it had been previously scheduled. Cope was requested to provide Laura's counsel with any handwritten notes or materials he relied upon in arriving at his opinion; however, when prompted to do so, Cope did not have his notes or calculations available, though he did offer to print them out from the computer program he used. Nonetheless, Cope testified that he took information provided from the "black boxes" of Laura's sedan and Jerry's pickup truck to determine the "delta-v," or what was described as the change in speed when the vehicles collided. Rosenbluth's examination of the black box in Laura's sedan yielded a twenty-seven to twenty-eight mile per hour "delta-v," which Cope argued, in a conclusory fashion, supported a finding that Laura was traveling forty-five miles per hour at the time of impact. Cope then changed his testimony on two occasions to ratchet up Laura's speed of travel. On the first occasion, Cope argued that Laura was traveling forty-five to fifty-five miles per hour at the time of impact. Next, he argued that Laura could have been traveling sixty miles per hour. Cope's own calculations yielded a "delta-v" that was forty to forty-five miles per hour, a figure that contradicted that which was calculated based upon data obtained from the black box of

Laura's sedan. Cope did not have any explanation for the discrepancy; however, on appeal, appellants argue that "common sense alone would tell even a lay person that she [Laura] very likely was going about 45 m.p.h." Though he did not explain the calculations made to arrive at his "delta-v" calculation, Cope argued that he merely inputted information given to him into a computer program, EDCRASH, which produced the challenged result. In fact, Cope admitted to not having done any calculations himself prior to arriving at his opinion. Cope, an accident reconstructionist, was unable to explain the calculations necessary to arrive at the "delta-v," and he admitted that he relied on the initial deposition testimony given by Laura and Miguel even though material portions of the desposition testimony had been changed with the trial court's approval.

Cope also opined that Jerry's pickup truck was at rest or nearly at rest when the collision with Laura's sedan occurred. Appellants argue that Cope used measurements from AUTOCAD, another computer program used in accident reconstruction, scaled the measurements to the pictures of the vehicles provided, including the actual crash depths, and made his determination that the collision with Laura caused Jerry's death. Appellants also argue that Laura's objections to Cope's testimony go to the weight of the testimony, not its admissibility. We disagree.

The record demonstrates that Cope arrived at a "delta-v" that varied wildly from that obtained from the black box of Laura's sedan and that Cope cannot explain why such a discrepancy exists. Moreover, Cope was repeatedly asked to explain how he arrived at his opinion and what calculations were done; however, he was unable to

adequately explain his calculations or how he arrived at his conclusions. Cope also stated that Laura's sedan collided with Jerry's pickup truck on the passenger side, though other eyewitnesses testified to the contrary. Cope stated that his analysis of the accident demonstrated that the Kia had in fact collided with the driver's side of Jerry's pickup truck. Cope also admitted that when using the computer programs, he made a typographical error in inputting the weight of Laura's sedan, which distorted all of his calculations. Cope, based solely on the photographs and his own analysis of the accident, disagreed with eyewitnesses who stated that Jerry's pickup truck collided with the high curbs of the bridge at least two different times. Cope initially disagreed with Deputy Neumann's assessment that Jerry was likely driving too fast when he encountered the bridge. However, Cope later recanted and acknowledged that Jerry entered "the bridge unsafely which resulted in his vehicle spinning out of control." Cope testified that the Kia had minor damage, though other witnesses, even Edgar, testified that the damage to the Kia was fairly significant.[7] Cope assumed that the damage to the Kia was minor because none of the vehicle's occupants were seriously injured. Later, Cope stated that: "I'm assuming that he [Jerry] died of a severe head trauma . . . as a result of impact." Cope explained that, in determining the cause of Jerry's death, he relied on an autopsy report, which does not exist, and the testimony of other witnesses in arriving at his conclusion about Jerry's injuries. Cope argued that Jerry's injuries were caused by Laura's sedan because of "[t]he amount of intrusion into

---

[7] Deputy Neumann rated the damage to the Kia as a five on a scale between one and seven, with one representing minimal damage and seven representing a total destruction of the vehicle.

the occupant compartment space by the Lexus." However, Cope denied having examined Jerry's body or having medical expertise to make such a conclusion. Finally, at the end of his deposition, Cope stated that his conclusion that Laura caused Jerry's death was based on a number of assumptions which, based on our review of the record, were demonstrated to be faulty.

The supreme court has held that courts are not to decide whether an expert's conclusions are correct, but instead whether the analysis used to reach the conclusions is reliable. *Gammill*, 972 S.W.2d at 728; *see Hughes*, 306 S.W.3d at 239. And if they are based on flawed methodology, then the conclusions are unreliable. *Gammill*, 972 S.W.2d at 728; *see Hughes*, 306 S.W.3d at 239. Here, Cope admitted that his calculations vary wildly from information obtained from the black box in Laura's sedan, and he does not explain the variation or, in other words, he failed to bridge the analytical gap between the facts and his conclusions. *See Hughes*, 306 S.W.3d at 239; *see also Joiner*, 522 U.S. at 146, 118 S. Ct. at 518-19; *Ledesma*, 242 S.W.3d at 39; *Gammill*, 972 S.W.2d at 728. In addition, much of Cope's testimony is against the great weight of the evidence contained in the record, especially the testimony of witnesses who personally observed the accident. *See Hughes*, 306 S.W.3d at 239 ("Reliability may be demonstrated by the connection of the expert's theory to the underlying facts and data in the case."). Cope acknowledges that many of his calculations are premised on assumptions that were demonstrated to be faulty. Though Cope has extensive experience in accident reconstruction, there exists too many analytical gaps between his opinions and the facts contained in the record. *See Hughes*, 306 S.W.3d at 239; *see also Joiner*, 522 U.S. at 146, 118

S. Ct. at 518-19; *Ledesma*, 242 S.W.3d at 39; *Gammill*, 972 S.W.2d at 728. Furthermore, Cope did not demonstrate that he was qualified to opine as to the cause of Jerry's injuries; in fact, his determination of the injury that killed Jerry varies from the determinations of Dr. Davies and Edgar—that Jerry died from exsanguinations. *See, e.g., Schronk*, 2009 Tex. App. LEXIS 5654, at *30 (citing *Thomas*, 2007 Tex. App. LEXIS 6655, at **8-9; *Marts*, 111 S.W.3d at 703-04); *see also Burke*, 229 S.W.3d at 478 (citing *Crye*, 907 S.W.2d at 500; *Myers*, 411 S.W.2d at 713). Based on the foregoing, we conclude that Cope's opinions are unreliable and that the trial court did not abuse its discretion in striking Cope's testimony. *See Sanchez*, 997 S.W.2d at 590; *Gammill*, 972 S.W.2d at 718-19; *see also Robinson*, 923 S.W.2d at 558. Accordingly, we overrule appellants' second issue.

### III. APPELLANT'S MOTION TO LIMIT THE TESTIMONY OF APPELLEE AND HER HUSBAND

By their fourth issue, appellants assert that the trial court erred in denying their motion to limit the testimony of Laura and Miguel. Essentially, appellants contend that the trial court erred in allowing Laura and Miguel to make changes to their deposition testimony after the twenty-day time frame outlined in Texas Rule of Civil Procedure 203.1(b) had passed. We disagree.

In their motion to limit Laura and Miguel's testimony, appellants essentially moved the trial court to exclude evidence of changes made to Laura and Miguel's deposition testimony. We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *See City of Brownsville v. Alvarado*, 897 S.W.2d

750, 753 (Tex. 1995). Texas Rule of Civil Procedure 203.1(b) provides that a witness may change his or her responses as reflected in the original deposition transcript by making changes on a separate sheet of paper and indicating the reasons for making the changes. TEX. R. CIV. P. 203.1(b). Rule 203.1(b) further provides that:

> The witness must then sign the transcript under oath and return it to the deposition officer. If the witness does not return the transcript to the deposition officer within 20 days of the date the transcript was provided to the witness or the witness's attorney, *the witness may be deemed to have waived the right to make the changes.*

*Id.* (emphasis added).

The inclusion of the term "may" in rule 203.1(b) does not impose a mandatory duty on the trial court, but rather indicates that the trial court has discretion in determining whether a witness had waived his or her right to make changes to their deposition testimony by failing to return the revised transcript to the deposition officer within twenty days. *See id.*; TEX. GOV'T CODE ANN. § 311.016(2) (West 2005) (providing that the term "shall . . . imposes a duty"); *see also United States v. Rodgers*, 461 U.S. 677, 706, 103 S. Ct. 2132, 2149, 76 L. Ed. 2d 236 (1983) ("The word 'may' . . . usually implies some degree of discretion."); *Ramsay v. Tex. Trading Co., Inc.*, 254 S.W.3d 620, 631 (Tex. App.—Texarkana 2008, pet. denied) (stating that the term "may" is generally construed as permissive); *In re J.L.W.*, 919 S.W.2d 841, 842 (Tex. App.—El Paso 1996, no writ) (noting that the term "shall" is generally construed to be mandatory, but it also may be construed as directory). Therefore, even though it is undisputed that appellees did not return the revised deposition transcript to the deposition officer within the twenty-day deadline, it was within the discretion of the trial court to accept the changes or conclude

that appellees waived the right to make the tendered changes. *See* TEX. R. CIV. P. 203.1(b); *see also Rodgers*, 461 U.S. at 706, 103 S. Ct. at 2149.

In the present case, counsel for appellants deposed Laura and Miguel on September 17, 2008. The court reporter forwarded Laura and Miguel's deposition transcripts to defense counsel on September 29, 2008, with a return date of October 20, 2008. Laura and Miguel made several substantive changes to their deposition testimony, including testimony regarding how far and how long they traveled until they took action to avoid Jerry's oncoming pickup truck, via errata sheets in compliance with rule 203.1. *See* TEX. R. CIV. P. 203.1. The errata sheets were returned to the court reporter on November 13, 2008. Between the due date of October 20, 2008 and the date of actual return, November 13, 2008, there does not appear to have been any significant activity that transpired in this case. It was not until two years later, on November 17, 2010, that appellants complained about the timeliness of the changes made to Laura and Miguel's deposition testimony.[8]

In arguing that the changes were untimely, appellants cite to federal cases, which rely on Federal Rule of Civil Procedure 30 regarding changes to deposition testimony— a rule that varies significantly from Texas Rule of Civil Procedure 203.1. *See* FED. R. CIV. P. 30[9]; *see also Reed v. Hernandez*, 114 Fed. Appx. 609, 611 (5th Cir. 2004); *Raytheon Co. v.*

---

[8] We also note that though Cope stated in his deposition that he relied on Laura and Miguel's initial deposition testimony, Cope did not specify when he made his calculations or that he had insufficient time to amend his calculations given the changes authorized by the trial court.

[9] Federal Rule of Civil Procedure 30(e) provides that:

*Indigo Sys. Corp.*, No. 4:07-cv-109, 2009 U.S. Dist. LEXIS 12558, at **5-11 (E.D. Tex. Feb. 18, 2009). In addition, appellants contend that, by allowing Laura and Miguel to change their deposition testimony in an untimely manner, other litigants would attempt to make eleventh hour changes to exact harm and prejudice on opposing parties. We are not persuaded by this argument because the rule clearly vests discretion with the trial court to determine whether such changes should be allowed. Should it believe that a party's changes would inflict harm or prejudice on opposing parties, the trial court has the discretion to conclude that such changes were waived. *See* TEX. R. CIV. P. 203.1. Finally, appellants contend that Laura and Miguel should not have been allowed to change their deposition testimony without providing an excuse for the delay or, in other words, provide "good cause" for the delay. Based on our reading of rule 203.1, we cannot agree with appellants' insistence that Laura and Miguel were duty-bound to provide an excuse to explain the delay. *See id.* To endorse appellants' argument would be to add language to rule 203.1(b) which does not exist. *See id.* We decline to do so.

Given that appellants waited nearly two years to object to the timeliness of the changes and the record does not demonstrate that appellants were harmed by the delay,

---

Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

  (A) To review the transcript or recording; and

  (B) If there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

FED. R. CIV. P. 30(e). Unlike Texas Rule of Civil Procedure 203.1(b), the plain language of Federal Rule of Civil Procedure 30 does not afford the trial court with discretion to accept or reject changes made to deposition testimony outside of the specified time frame. *See id.; see also* TEX. R. CIV. P. 203.1(b).

we cannot say that the trial court abused its discretion in concluding that Laura and Miguel did not waive their right to change their deposition testimony and, thus, denying appellants' motion to limit the deposition testimony of Laura and Miguel. *See* TEX. R. CIV. P. 203.1(b); *see also Rodgers*, 461 U.S. at 706, 103 S. Ct. at 2149. Accordingly, we overrule appellants' fourth issue.

## IV. APPELLEE'S NO-EVIDENCE MOTION FOR SUMMARY JUDGMENT

By their first issue, appellants contend that the trial court erred in granting Laura's no-evidence motion for summary judgment because the deposition testimony of Dr. Davies, Edgar, and Cope amounted to more than a scintilla of evidence to create a material fact issue as to the causation element of their underlying cause of action; therefore, the trial court was precluded from granting summary judgment in favor of Laura.

We review a trial court's summary judgment de novo. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). A no-evidence motion for summary judgment is essentially a motion for pretrial directed verdict, and we apply the same legal sufficiency standard on review. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 581 (Tex. 2006); *see also Humphrey v. Pelican Isle Owners Ass'n*, 238 S.W.3d 811, 813 (Tex. App.—Waco 2007, no pet.). Once such a motion is filed, the burden shifts to the non-moving party to present evidence raising an issue of material fact as to the elements specified in the motion. *See Tamez*, 206 S.W.3d at 583; *see also* TEX. R. CIV. P. 166a(i) (providing that the non-movant must provide "summary judgment evidence raising a genuine issue of material fact"). A genuine issue of material fact exists if more than a

scintilla of evidence establishing the existence of the challenged element is produced. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). More than a scintilla of evidence exists when the evidence "'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'" *Id.* (quoting *Havner*, 953 S.W.2d at 711). On the other hand, evidence does not amount to more than a scintilla if it is "so weak as to do no more than create a mere surmise or suspicion" of fact. *Chapman*, 118 S.W.3d at 751; *see Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983). In determining whether the non-movant has produced more than a scintilla of evidence, we review the evidence in the light most favorable to the non-movant, crediting such evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004); *see also Tamez*, 206 S.W.3d at 582; *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005).

In the present case, appellants have not provided any evidence as to the element of causation besides the deposition testimony of Dr. Davies, Edgar, and Cope. Because we have previously concluded that the trial court did not abuse its discretion in striking the testimony of Dr. Davies, Edgar, and Cope, and because appellants have not proffered more than a scintilla of evidence creating a material fact issue as to the element of causation, we cannot say that the trial court erred in granting Laura's no-evidence motion for summary judgment. *See* TEX. R. CIV. P. 166a(i); *Tamez*, 206 S.W.3d at 581; *Knott*, 128 S.W.3d at 215; *see also Humphrey*, 238 S.W.3d at 813. Accordingly, we overrule appellants' first issue.

## V. APPELLEE'S MOTION TO SEVER

By their third issue, appellants complain about the trial court's severance order. Specifically, appellants contend that severance was not proper in this case because State Farm did not make any offers to settle, nor did appellants make any extra-contractual claims against State Farm; therefore, there is no evidence of prejudice authorizing the trial court to sever appellants' claims against Laura from those against State Farm.

A separate trial of any claim or issue may be ordered by the trial court in furtherance of convenience or to avoid prejudice. *See* TEX. R. CIV. P. 174(b); *see also Guar. Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 658 (Tex. 1990) (op. on reh'g). Under the rules of civil procedure, any claim against a party may be severed and proceeded with separately. TEX. R. CIV. P. 41. We review the trial court's decision to grant appellees' motion to sever for an abuse of discretion. *See Liberty Nat'l Fire Ins. Co. v. Akin*, 927 S.W.2d 627, 629 (Tex. 1996). A claim is properly severable if (1) the controversy involves more than one cause of action, (2) the severed claim is one that would be the proper subject of a lawsuit if independently asserted, and (3) the severed claim is not so interwoven with the remaining action that they involve the same facts and issues. *See Guar. Fed. Sav. Bank*, 793 S.W.2d at 658; *see also* TEX. R. CIV. P. 41 (providing that "actions which have been improperly joined may be severed . . . on such terms as are just. Any claim against a party may be severed and proceeded with separately").

The basis of Laura's severance motion was to prevent the injection of insurance into the jury's determination of liability and damages. In their live pleading, appellants

contended that Laura was "operating an underinsured motor vehicle (insured in only the amount of $50,000)." The alleged underinsurance of Laura's vehicle appears to serve as the purpose for joining State Farm in this lawsuit. And, as noted earlier, appellants alleged that Laura was negligent in operating her vehicle for a number of reasons. Texas Rule of Evidence 411 provides that:

> Evidence that a person was or was not insured against liability is not admissible upon the issue whether the person acted negligently or otherwise wrongfully. This rule does not require the exclusion of evidence of insurance against liability when offered for another issue, such as proof of agency, ownership, or control, if disputed, or bias or prejudice of a witness.

TEX. R. EVID. 411. Because rule 411 precludes the introduction of insurance upon the issue of whether a person acted negligently or wrongfully and because evidence that Laura was underinsured was not offered for the above-mentioned exceptions, it would appear that rule 411 would support severance. *See id.* Furthermore, and perhaps most importantly, State Farm was joined in this lawsuit because Laura was allegedly underinsured. Because we have concluded that the trial court did not err in granting summary judgment, Laura is not liable to appellants. As a result, the issue of underinsurance is moot. *See Allstate Ins. Co. v. Hallman*, 159 S.W.3d 640, 642 (Tex. 2005) (noting that a case becomes moots if a controversy no longer exists or if the parties lack a legally cognizable interest in the outcome). Accordingly, we conclude that the trial court did not abuse its discretion in severing appellants' claims against Laura for convenience and to avoid prejudice. *See* TEX. R. CIV. P. 174(b); *see also Akin*, 927 S.W.2d at 629; *Guar. Fed. Sav. Bank*, 793 S.W.2d at 658. We overrule appellants' third issue.

## VI. CONCLUSION

Having overruled all of appellants' issues, we affirm the judgments of the trial

court.


AL SCOGGINS
Justice


Before Chief Justice Gray,
      Justice Davis, and
      Justice Scoggins
Affirmed
Opinion delivered and filed August 3, 2011
[CV06]